**In the Interest of A.M.F. and D.R.F., Minor Children,**

**Greene County Juvenile Office, Petitioner–Respondent,**

v.

**P.F., Respondent–Appellant.**

No. 25883.

Missouri Court of Appeals, Southern District, Division One.

June 21, 2004.

Motion for Rehearing or Transfer Overruled July 13, 2004.

Application for Transfer Denied Aug. 24, 2004.

Larry B. Moore, Springfield, for appellant.

Bill Prince, Springfield, for respondent.

PHILLIP R. GARRISON, Judge.

This appeal presents for our review the trial court's judgment terminating the parental rights of P.F. ("Mother") and G.F. ("Father") as to their minor children, A.M.F. ("Daughter") and D.R.F. ("Son") (collectively, "the children") at the request of the Greene County Juvenile Office ("Respondent").[1] In one point on appeal, Mother alleges that the trial court committed reversible error in finding that there was clear, cogent and convincing evidence that she suffers from a permanent mental condition that renders her unable to provide her children the necessary care, custody and control. We affirm the judgment of the trial court.

In reviewing a trial court's judgment terminating parental rights, we consider the facts and reasonable inferences therefrom in the light most favorable to the judgment. *In the Interest of B.L.B.*, 834 S.W.2d 795, 799 (Mo.App. E.D.1992). Viewed through this lens, the evidence pertinent to Mother's claim revealed the following. Mother has a long history of mental health issues, beginning with a suicide attempt in 1973. She was hospitalized in a psychiatric institution from 1980 to 1981. Daughter was born in 1986 and Son was born in 1992, four years before Mother and Father were divorced in March 1996. Pursuant to the judgment of dissolution, Mother was awarded custody of the children. During the summer of the following year, however, the children moved in with Father, as Mother was unable, by her own admission, to discipline or take care of them.

Two years later, Mother entered a program administered by Burrell Mental Health Center ("Burrell") that involved, among other things, her relocation to an assisted living, semi-independent apartment setting. On October 25, 1999, as a part of Mother's program with Burrell, Mother submitted to a psychiatric evaluation by Dr. Antonio Dimalanta ("Dimalanta"), who diagnosed her with "past history" of major depression and also said there was a question about possible delusions. Dimalanta testified that he recommended Mother take medication to reduce her delusional symptoms but, for reasons unknown to him, Mother refused to do so.

In June 2000, the Missouri Department of Family Services ("DFS") investigated a report from the Springfield, Missouri Police Department that the children were being subjected to physical and sexual abuse and neglect at the hands of Father. As a result of this and several prior reports of abuse and neglect, the children were taken into temporary protective custody by DFS and subsequently allowed to live with relatives. When, however, attempts to keep the family intact were unsuccessful, DFS took custody of the children in September 2000 and has maintained custody of them to the present time, with the children placed in various foster care settings.

---

1. Father made no appearance on the second day of the underlying two-day hearing and the trial court found clear, cogent, and convincing evidence in support of the petition as to Father and terminated his parental rights. This aspect of the trial court's judgment is not a subject of this appeal and is left undisturbed by our opinion.

As a result of Father's subsequent incarceration and continued unwillingness to adhere to any program for reuniting him with the children, in October 2001 DFS began attempting to determine if reuniting the children with Mother could be a viable option. Mother continued, however, during all of 2001, to refuse medication despite the advice of her Burrell case worker. She attended seven of nine parenting classes offered from October 2001 to January 2002 and, while she participated actively in some of those classes, she also slept through portions of them.

From December 2001 to January 2002, Mother paid three visits to a psychologist, Dr. Mark Bradford ("Bradford"), at the request of DFS. From his clinical observations, Bradford determined Mother was "highly distractible," "had difficulty talking about some of [her] issues," and displayed "quick flight of ideas," traits not uncommon in persons with bipolar disorder. These observations, coupled with the results of various psychological tests, led Bradford to diagnose Mother with, at minimum, schizo-affective disorder, bipolar type. Bradford described Mother's condition as one characterized by "wild mood swings," misinterpretation of events and people, and "project[ion]" of emotions upon other people. He opined that the disorder would be "difficult ... to control" and that it would be "difficult to—to correct and discipline children if you're misinterpreting the reality of what they're—if you're projecting your emotions or feelings upon them at any given moment." He also noted that the condition would likely not improve without medication, that left untreated the disorder would result in "[o]ccasional impulsive behaviors [sic]," regression, difficulty maintaining employment, "[p]ersonality problems," "[f]riction" in relationships, and "confus[ion]" in child-rearing. Asked at trial what would be his prognosis concerning Mother's ability to parent children if her disorder were left untreated, he stated that it "wasn't good."

On January 18, 2002, Mother was seen by Dr. Alok Jain ("Jain"), a staff psychiatrist with Burrell, for a psychiatric evaluation. Based on his observations, Jain diagnosed Mother with bipolar disorder, with possible personality change due to prior head trauma. He also expressed concern that Mother's condition was at times manifesting itself through psychotic symptoms, including auditory and visual hallucinations. Although Jain's prognosis for Mother was poor without medical treatment, and despite his belief that her ability to parent children would be impaired without treatment, Mother adamantly continued to refuse any recommended medication.

On February 6, 2002, Respondent filed the underlying petition to terminate the parental rights of Mother and Father. As to Mother, the petition alleged statutory grounds for terminating her parental rights, to wit: the children had been abused and/or neglected in that Mother suffers from a mental condition, "which is either permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders [Mother] unable to knowingly provide the children the necessary care, custody and control," and that the children had been in the jurisdiction of the juvenile court for more than one year with no improvement having occurred or expected. The petition further alleged that it was in the best interests of the children that Mother's parental rights be terminated.

Trial of Respondent's petition was had on October 15, 2002 and April 14, 2003, after which, on June 10, 2003, the trial court issued its judgment terminating the parental rights of both Father and Mother. This appeal followed.

In her sole point, Mother contends that it was error for the trial court to find that there was sufficient clear, cogent, and convincing evidence presented proving that Mother suffered from a mental abnormality that was either permanent in nature or such that there was no reasonable likelihood it could be reversed, and which rendered Mother unable to provide the children the necessary care, custody, and control.

■■■ We note at the outset that this is all that Mother's point alleges. No issue is taken with the trial court determination that a second statutory ground existed for terminating her parental rights, as pled by Respondent, namely, that the children had been in the custody of the juvenile court for more than one year, that the conditions that led to the assumption of said jurisdiction persisted, and that no reasonable likelihood existed that those conditions could be remedied at an early date so that the children could be returned to Mother. *See* Section 211.447.4(3).[2] Where multiple statutory grounds for terminating parental rights are found, a reviewing court need only find that one of these bases is supported by the record and that the termination of parental rights was in the best interests of the children. *In the Interest of B.N.W.*, 115 S.W.3d 869, 871 (Mo.App. S.D.2003). "Thus, if an appellant fails to challenge each of the termination grounds found by the trial court, it is unnecessary for the appellate court to address the specific ground that is challenged." *Id.* Notwithstanding this, the fact that the termination of parental rights is "one of the most serious acts a court is empowered to perform," persuades us to, *ex gratia*, address the merits of Mother's claim. *Id.*

■■■ The decision of a trial court to terminate parental rights will be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *In the Interest of J.L.F.*, 99 S.W.3d 15, 17 (Mo.App. S.D.2003). However, cases involving the termination of parental rights are reviewed more closely than others because of the fundamental liberty interests associated with family and child rearing. *In the Interest of C.N.G.*, 109 S.W.3d 702, 705 (Mo.App. W.D.2003). "Terminating parental rights is an exercise of an awesome power and should not be done lightly." *Id.* at 705 (citations omitted).

■■■ In considering a petition to terminate parental rights, a trial court employs a two-pronged test set out in Section 211.447: first, the court must find "clear, cogent and convincing" evidence that a statutory ground for termination exists. *In the Interest of C.L.W.*, 115 S.W.3d 354, 355 (Mo.App. S.D.2003). Clear, cogent and convincing evidence is that which "instantly tilts the scales" in favor of termination when weighed against the evidence presented by the parent whose rights were terminated. *Id.* at 355–56; *In the Interest of A.R.*, 52 S.W.3d 625, 633 (Mo.App. W.D. 2001). Second, the trial court must determine whether termination of parental rights is in the child's best interest notwithstanding that a legal ground for termination has been proven. *In the Interest of A.T.*, 88 S.W.3d 903, 905 (Mo.App. S.D. 2002).

■■■ Mother appears to take issue specifically with a portion of paragraph six of the trial court's conclusions of law, which reads as follows:

6. Based on evidence presented in this proceeding, this Court finds and concludes based on clear, cogent and convincing evidence that the allega-

**2.** References to statutes are to RSMo (2000) unless otherwise indicated.

tions contained in the Petition to Terminate Parental Rights are true and the statutory grounds for the termination of parental rights of [Mother] and [Father] exist in that:

a. The children were neglected by [Mother] and [Father]. [Mother] suffers from a mental condition as previously described herein. The minor child, [A.M.F.], was subjected to acts of physical and sexual abuse by [Father].

b. The children have been under the jurisdiction of the court for in excess of one year and the conditions leading to the assumption of jurisdiction continue to exist.

Mother contends the evidence presented at the hearing was insufficient to support the finding as to her contained in subparagraph (a), namely, that Mother suffered from a mental condition that the trial court, pursuant to statutory mandate, had previously found to be "shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control[.]" Section 211.447.4(2)(a). We disagree.

As previously described, the record clearly indicates that Mother had long-standing psychiatric problems dating to at least 1973, when she attempted suicide. Dimalanta testified that he diagnosed Mother in 1999 with "past history of major depression." He described Mother's condition as characterized by mood swings, hallucinations and delusional thinking. Mother was again evaluated in January of 2002, by Jain, who testified that Mother suffered from bipolar disorder and possible personality change due to past head trauma. Jain also stated that Mother was having psychotic symptoms as evidenced by auditory and visual hallucinations. Finally, Bradford diagnosed Mother as suffering from schizo-affective disorder, bipolar type. He testified that this mental condition was characterized by wild mood swings which would result in confusion to any children parented by Mother and that, if left untreated, Mother's mental condition could cause children parented by her to suffer from mental health issues as well. Notably, each of these three mental health professionals testified that they strongly recommended Mother be placed on a regime of medication, which advice Mother adamantly and consistently refused.

In addition to clinical evaluations, the record, also contains specific examples of the impact Mother's mental condition had on her ability to parent the children effectively. When the children were taken into DFS custody following a disturbance at Father's home in June 2000, Mother told law enforcement officials that she was employed by the Central Intelligence Agency and that the police were making an unlawful arrest. Previously, she had taken A.M.F. to a river and attempted to strangle her. As previously noted, Dimalanta and Bradford were concerned about Mother's hallucinations and delusions. A parent educator also testified that he had concerns that Mother's mental health issues were negatively impacting upon her ability to parent, that Mother had trouble understanding the limits that needed to be set for children and failed to demonstrate any normal parent-child interaction with the children.

All of the foregoing belies Mother's contention that the trial court's findings concerning her mental condition were against the weight of the evidence or unsupported by substantial evidence. See J.L.F. at 17. In compliance with statutory mandate, the trial court made findings sufficient to establish that Mother suffered from a mental

condition "shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control[.]" Section 211.447.4(2)(a). In short, "we find that [there] was adequate evidence presented from which the [trial] court could have found that Mother suffered from a mental condition which rendered her unable to knowingly provide [the children] with the requisite and necessary care, custody and control, as outlined by the subdivision under discussion." *In re S.L.N.*, 8 S.W.3d 916, 926 (Mo.App. S.D.2002) (affirming judgment of termination where parent was diagnosed with depression, suicidal ideation, and bipolar disorder that was "unlikely to change").

 It is well to note that a diagnosis of mental illness does not *per se* render a parent unfit or justify, by itself, a judicial determination of neglect or abuse. *See In the Interest of C.P.B.*, 641 S.W.2d 456, 460 (Mo.App. E.D.1982). Rather, in order to terminate a person's parental rights on the ground of "mental illness," it must be shown that the child was harmed or is likely to be harmed in the future. *In the Interest of D.L.M.*, 31 S.W.3d 64, 69–70 (Mo.App. E.D.2000). Here, evidence supported such a finding in that Mother attempted to strangle A.M.F., expert witnesses testified to concerns that Mother's condition and resulting parenting deficiencies could result in the children developing mental health problems, conduct disorders and substance abuse problems of their own, and Mother consistently refused recommended medication for her condition. Moreover, the trial court found that the evidence revealed an extended relationship with DFS, as evidenced by numerous "hotline" reports suggesting educational neglect, lack of food, lack of supervision, and

rejection through indifference. The children reported to their therapist that the parental home was characterized by fighting, lack of food and lack of hygiene. Additionally the evidence established that Mother had not cared for the children since 1997, and had not, since that time, demonstrated an ability to provide the children with the necessary care, custody and control.

Contrary, then, to Mother's contention here, the evidence amply supported the trial court's finding, pursuant to Section 211.447.4(2), that Mother suffered from a permanent mental condition that resulted in her neglect of the children. Consequently, the judgment did not misstate or misapply the law in any manner alleged by Mother in this appeal, nor was it against the weight of the evidence or unsupported by substantial evidence. Mother's point is denied and the trial court's judgment is affirmed.

BARNEY, P.J., concurs.

PREWITT, J., concurs in separate opinion.

JAMES K. PREWITT, Judge, concurring.

I concur in the principal opinion. Although it has occurred in the past, where the disposition of a point cannot change the result, I see no reason to review that point without also giving plain error review to the other statutory ground for termination.

Mother did not brief the second statutory ground for termination of her parental rights, that "[t]he children have been under the jurisdiction of the juvenile court for in excess of one year and the conditions which led to the assumption of jurisdiction still persist[.]" There was, however, ample evidence of that statutory ground as there was for the statutory

ground addressed in the opinion above. There was evidence that Mother failed and refused to follow through with the recommended therapy and medication as described above and that her failure and refusal in that regard persisted. In addition, there was evidence from Vickie Lovejoy, a DFS caseworker, that Mother had not complied with her treatment plan. Mother had not kept DFS fully informed of Mother's household composition, including the presence of a boyfriend in Mother's household that had allegedly subjected Daughter to inappropriate sexual contact.

Although Mother attended 10 of 12 parenting classes, there was evidence that she fell asleep during the sessions. She also failed to complete all required assignments of the program. Mother failed to provide verification of either stable employment or attendance at or participation in individual therapy, attending only five sessions and, according to Dr. Joyce Everson, Mother made no progress because Mother had the opinion "that she didn't have any issues to work on[.]" Mother delayed her psychiatric evaluation with Dr. Bradford (referenced in the opinion above), canceling many appointments, and he indicated that she did not complete the evaluation, and his opinions were based on the portion of the evaluation that she did complete.

Thus, although as stated above it is unnecessary to address either statutory ground as Mother only appealed with regard to one of them, *B.N.W.*, 115 S.W.3d 869, 871 (Mo.App.2003), there was clear, cogent and convincing evidence of the second statutory ground.