228 S.W.3d 77 (2007)
In the Interest of C.A.L., a child under seventeen years of age.
No. 28114.
Missouri Court of Appeals, Southern District, Division One.
July 3, 2007.
*79 Christopher A. Hazelrigg, Springfield, for Appellant.
William C. Prince, Springfield, for Respondent Greene County Juvenile Office.
Linda K. Thomas, Springfield, for Minor.
NANCY STEFFEN RAHMEYER, Presiding Judge.
J.B.L. ("Father") appeals the judgment terminating his parental rights to C.A.L.[1] Father claims that both of the grounds cited by the judgment were unsupported by substantial evidence. We agree and reverse.
C.A.L. was born to L.W. ("Mother") and Father on September 26, 2000, with a partial cleft lip and cleft palate. While C.A.L. was living with his parents in Oregon County, the Children's Division received a hotline call claiming that C.A.L. was failing to thrive. Specifically, C.A.L. had low weight and instead of gaining weight there was a possibility he was losing weight. On March 3, 2001, after moving to Greene County, C.A.L. was hospitalized for pneumonia. This resulted in another hotline call concerning C.A.L.'s failure to thrive and loss of weight. After being dismissed from the hospital on March 7, 2001, C.A.L. was to be weighed weekly and have weekly doctor's visits.
On March 27, 2001, C.A.L. was weighed at the Women, Infant and Children's ("WIC") Office. The scale indicated that C.A.L. had gained one pound. However, C.A.L.'s primary physician expressed concern that C.A.L. was not weighed on the scale in her office because of possible variations in the scales. On March 28, 2001, C.A.L. was placed in protective custody.[2]
On July 2, 2001, the trial court approved and ordered a treatment plan whereby Father would: provide and maintain a stable place of residence; not allow individuals who pose a threat to C.A.L. to frequent or reside in the household; cooperate with the Children's Division's social worker by following all treatment recommendations and informing the social worker of all changes in address and household composition; sign release of information forms; visit C.A.L. a minimum of twice per month; maintain gainful employment; attend parenting classes and provide proof of completion; cooperate in obtaining a psychological evaluation and follow any recommendations; attend and participate in individual and/or family counseling as recommended by the Children's Division; and attend and participate in all scheduled medical appointments for C.A.L.
On April 30, 2002, the Greene County Juvenile Office ("Respondent") filed a petition to terminate the parental rights of *80 Father. The petition alleged in relevant part that Father abused and/or neglected C.A.L.; that C.A.L. has been under the jurisdiction of the juvenile court for a period of one year and the conditions which led to the assumption of jurisdiction still persist and there is little likelihood that those conditions will be remedied at an early enough date so that C.A.L. can be returned to Father; that Father has not complied with the terms of his treatment plan; and that it would be in the best interest of C.A.L. to terminate Father's parental rights.
The trial court heard testimony and received evidence regarding these allegations on December 2 and December 3, 2004, and January 18, March 16 and 17, and April 15, 2005. It initially entered a judgment terminating Father's parental rights on December 12, 2005. In the judgment, the court did not include any grounds concerning Father. Respondent filed a Motion to Set Aside Judgment on December 15, 2005, which the trial court granted. Approximately nine months later, a new judgment was entered terminating Father's parental rights on September 14, 2006. This Judgment found two grounds for termination: C.A.L. has been neglected; and C.A.L. has been under the jurisdiction of the juvenile court for in excess of one year and the conditions which led to the assumption of jurisdiction still persist. It also found that termination was in the best interests of C.A.L.
The termination of parental rights is an awesome power that involves fundamental liberty interests associated with family and child rearing. In re A.M.F., 140 S.W.3d 201, 205 (Mo.App. S.D.2004). For that reason, we review the record very closely to ensure this awesome power was properly undertaken. Id. In his first point, Father claims the trial court erred in finding, as a ground for terminating his parental rights pursuant to § 211.447.4(2),[3] that Father neglected C.A.L. because this finding is not supported by substantial evidence and is against the weight of the evidence.
"An essential part of any determination whether to terminate parental rights is whether, considered at the time of the termination and looking to the future, the child would be harmed by a continued relationship with the parent." In re K.A.W., 133 S.W.3d 1, 9 (Mo. banc 2004).
[I]t is insufficient merely to point to past acts, note that they resulted in abuse or neglect and then terminate parental rights. Past behavior can support grounds for termination, but only if it is convincingly linked to predicted future behavior. There must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm.
Id. at 9-10 (internal citations omitted). Also, evidence of abuse or neglect sufficient to support termination must "be based on conduct at the time of termination, not just at the time jurisdiction was initially taken." Id. at 10.
In finding that Father neglected C.A.L., the trial court found that Father failed to consistently visit, contact, or maintain a parental relationship with C.A.L. while he was in foster care. When jurisdiction over C.A.L. was first assumed, Father consistently visited C.A.L. until October 2001, *81 when his visitation rights were suspended following an allegation of alcohol abuse. An alcohol assessment was scheduled for November 5, 2001, but Father was unable to attend this assessment because his lung collapsed on November 4, 2001.
He subsequently completed two alcohol assessments in February 2002 and April 2002.[4] It was recommended that Father complete twelve weeks of outpatient treatment. Father completed this treatment through the Sigma House and his visitation rights were resumed in April 2002. He had weekly visitation with C.A.L. until October 2002, when Father requested extended visitation and the decision was made to move his visitation from weekly to every other week and that the length of the visit be increased from one hour to two hours due to the financial burden associated with missing work and driving from Alton, Missouri. The Children's Division complied with Father's request and Father consistently visited biweekly with C.A.L. until December 2004.[5]
In December 2004, Father moved from Alton, Missouri, to Paragould, Arkansas. Father did not visit C.A.L. from December 2004 until April 15, 2005, and testified that his failure to visit was because the financial burdens associated with such visitation had become prohibitive during that time. Unfortunately, there is nothing in the record showing whether Father's financial situation improved and whether he visited C.A.L. between April 15, 2005, and September 14, 2006, the date of termination. The reason there is no evidence of Father's visitation habits "at the time of termination" is because of the immense delay between the hearing of evidence and the date of termination. Evidence was heard by the trial court on six days starting December 2, 2004, and ending April 15, 2005. However, a final judgment terminating parental rights was not entered until September 14, 2006, approximately one year and five months after the last evidence was heard. Therefore, it is impossible for the trial court to have any understanding of Father's visitation habits "at the time of termination."
The trial court expressed concern that Father did not have stable housing, noting that on the last day of trial Father "was living with a friend and did not have independent housing."[6] After C.A.L. was first taken into foster care Father moved to Alton, Missouri, purchased a house and was making payments on said house. In February 2003, Father, knowing a home study was required in order to complete his treatment plan, contacted the Oregon County Children's Division and arranged a home study. On February 10, 2003, a home study was performed and the house was found to be "well within this community's standards at a level above minimum standard." Father made all the payments on the house until December 2004, when he moved to Paragould, Arkansas.
As noted, at the time of the April 15, 2005 hearing, Father was living alone in Gainesville, Arkansas. There was no information that the home was not "stable." More importantly, once again there was no *82 information available to the trial court concerning where Father was residing "at the time of termination." In the approximately one year and five months between the last day of trial, April 15, 2005, and the time of termination, September 14, 2006, the court had no information where Father was residing and whether it was a stable residence. There was not sufficient evidence available concerning Father's residence at the time of termination to find that it would not be suitable for C.A.L.
Although Father acknowledges that he did not provide C.A.L. with any direct financial support, he claims his in-kind support in the form of toys, diapers, and clothing, along with the financial burdens he incurred in visiting C.A.L., show he provided support to the best of his ability. The Children's Division never asked Father to provide financial support to C.A.L. and never inquired into Father's financial ability to support C.A.L. Further, Father testified that he lived paycheck to paycheck and his income was commission based. He had been employed with the same job since December 1994 and made approximately $250 per week with his annual income ranging from $7,000 to $15,000. At the time of the hearing Father was living in Arkansas, and before that he was living in Alton, Missouri. He testified that C.A.L. being in foster care caused him to incur considerable financial burdens. Specifically, he stated that when he came to Springfield, Missouri, to visit C.A.L. he lost one or two days of work, between forty to one hundred dollars for gas, and incurred general wear and tear on his automobile. He also had to take off work for parenting classes and court appearances.
As to the statutorily required factors under § 211.447.4, the court found that Father did not suffer from a mental condition rendering him unable to knowingly provide for C.A.L. § 211.447.4(2)(a). It found that while Father had used controlled substances and consumed alcohol in excess, no evidence was presented that Father had a current chemical dependency which would prevent him from providing for C.A.L. which could not be treated. § 211.447.4(2)(b). It found that there was no evidence that Father abused C.A.L. in any way. § 211.447.4(2)(c). The only factor the trial court found warranted its finding that Father neglected C.A.L. was finding that evidence had been presented showing Father repeatedly and continuously failed, although physically and financially able, to provide C.A.L. with adequate food, clothing, shelter, or education as defined by law. § 211.447.4(2)(d).
The issue under § 211.447.4(2)(d), is whether Father has fulfilled his affirmative duty to support, communicate with, and visit C.A.L. In re S.M.H., 160 S.W.3d 355, 367 (Mo. banc 2005). Nothing in the record indicates that Father's past behavior, as previously discussed, convincingly shows that he would be unable to provide adequate food, clothing, or shelter to C.A.L. if he was in Father's physical custody in the future. Substantial evidence does not support the finding that Father neglected C.A.L. by failing to financially support C.A.L. Based on the foregoing, we find the trial court's determination that parental termination was warranted because Father neglected C.A.L. was not based on substantial evidence. Point I is granted.
Likewise, substantial evidence does not support the court's second ground for termination. The court found that the conditions which led to the assumption of jurisdiction of C.A.L. still persist. This ground for termination is commonly referred to as "failure to rectify." As with a termination on the grounds of neglect, "[t]ermination for failure to rectify under *83 § 211.447.4(3) must be based on a determination that potentially harmful conditions continue to exist at the time of termination, not just that the conditions that led to jurisdiction persist." In re K.W., 167 S.W.3d 206, 214 (Mo.App. E.D. 2005).
Father's first responsibility under the treatment plan was to provide and maintain a stable place of residence. Father lived with Mother until October 2001. He then moved to Birch Tree, Missouri, where he resided with his father and stepmother until April 2002. From April 2002 until August 2002, Father lived in Springfield, Missouri, in Mother's apartment while she was incarcerated. From August 2002 until December 2004, Father resided in his own house in Alton, Missouri. As discussed, a home study was conducted on his house which found it "well within this community's standards at a level above minimum standard." He moved to Paragould, Arkansas, in December 2004, and on the last day of trial, April 15, 2005, was living alone in Gainesville, Arkansas. Unfortunately, as previously discussed, there was no information available to the trial court concerning where Father was residing "at the time of termination." In the approximately one year and five months between the last day of trial, April 15, 2005, and the time of termination, September 14, 2006, Father could have a stable residence and could be living anywhere. The trial court must make a determination that potentially harmful conditions continue to exist "at the time of termination." In this case, there was not sufficient evidence available concerning Father's residence at the time of termination to find that it was not a stable place of residence.
Father's second responsibility was to not allow people to frequent or visit his household who would pose a threat to C.A.L. He was also to report all changes in household composition to the Children's Division. No evidence was presented that Father allowed people who would pose a threat to C.A.L. to visit his household. However, the trial court found that Father failed to report changes in his household composition. The only evidence supporting this finding was Father's testimony that his daughter, her mother, and their two siblings stayed at his house in Alton, Missouri, for approximately six weeks. Father admits he did not personally inform the Children's Division but rather told his attorney. His attorney informed him that he would send the Children's Division a letter informing them of this temporary arrangement. The attorney never sent such letter. Such evidence does not show a consistent problem of Father intentionally refusing to report changes in his household composition and nothing in the record shows that the individuals staying in Father's house would pose any threat to C.A.L.
Father was to sign release of information forms. After having the forms reviewed by his attorney, Father complied with this aspect of the treatment plan.
The treatment plan required that Father visit C.A.L. a minimum of twice per month. The trial court found that Father "has not always visited with [C.A.L.] consistently." We have extensively discussed Father's visitation above and choose not to repeat what has already been written. However, being redundant, we note that there is nothing in the record showing whether Father visited C.A.L. between April 15, 2005, and September 14, 2006, the date of termination. As stated, evidence supporting termination for failure to rectify must be based on a "determination that potentially harmful conditions continue to exist at the time of termination." K.W., 167 S.W.3d at 214. Therefore, it is impossible for the trial court to have any *84 understanding of Father's visitation habits "at the time of termination."
Father was to maintain gainful employment and provide verification of his income to the Children's Division. The trial court found that Father reported that he was in compliance with this requirement but that his employment could not be confirmed because Father did not provide the Children's Division with verification. The trial court's findings indicate that Father's statement and testimony that he had employment was doubtful or that the Children's Division was concerned that perhaps Father was not employed. This is not the case. Father testified that he has continuously worked for the Daniel Lane Company and has occasionally taken other part-time work with companies, such as ADT Security and Diamond Plush. Ms. Alford, during her testimony, agreed with Father's work history and did not indicate that the Children's Division questioned his employment. Ms. Alford did state that the only verification she received was a copy of Father's W-2 form from 2002 from one company and a 1099 from another. Father does not dispute this but says that the reason he did not supply verification was that the Children's Division never asked for more verification. Based on Ms. Alford's testimony, it would appear that they never asked for verification because they never really questioned whether Father was employed. Given this fact, his failure to provide verification is not sufficient to support a termination based on failure to rectify.
More importantly the trial court had no information as to Father's current employment situation "at the time of termination." Father specifically testified, on April 15, 2005, that he had been sending out resumes and attempting to find a better job where he could make more money. During the approximately one year and five months from this testimony to the time of termination, it is conceivable that Father has a different job in a different location. Therefore, it impossible for the trial court to have any understanding of Father's employment "at the time of termination."
Father was to attend parenting classes and provide proof of completion. Father participated in parenting classes from April 16, 2002 until July 2, 2002. He completed these classes and the Children's Division received proof of completion.
Father was also to have a psychological evaluation done and follow any recommendations. Father obtained a psychological evaluation from Dr. Lane Andelin on August 13, 2001.[7] Dr. Andelin noted that Father was "experiencing an adjustment reaction to the recent circumstances surrounding the removal of his son from his custody" and expressed "frustration and irritated feelings regarding the situation." He specifically found that Father would "likely benefit from the resolution of the current custody situation." Unfortunately for Father, approximately six years has passed and the situation is still not resolved. Dr. Andelin also stated that "elective psychotherapy to assist him in this process [] may be helpful," but stopped short of requiring such psychotherapy. The trial court specifically found that Father "did not follow the recommendation to participate in family therapy." However, Ms. Alford testified that the Children's Division did not make a recommendation for family therapy or psychological therapy. Therefore, contrary to *85 the trial court's finding, the evidence in the record shows that Father complied with this requirement.
Father was to participate in individual and/or family counseling when recommended by the Children's Division. Ms. Alford stated that the only individual counseling the Children's Division recommended was for Father's alcohol usage. As previously discussed, Father complied with this request when he completed the Sigma House alcohol assessment and twelve-week outpatient treatment.
Finally, the treatment plan stated that Father was to attend and participate in all scheduled medical appointments for C.A.L. Initially, while Father was still living in Springfield, Missouri, he participated in the medical appointments unless his work schedule precluded such involvement. However, after moving outside of the Springfield area he was unable to attend. Ms. Alford testified that when Father returned to the Springfield area, presumably from April 2002 until August 2002, he was not allowed to participate in the medical appointments because the foster parents were not comfortable interacting with either biological parent.
It is important to note that "`[A] parent's failure to comply with a written service agreement does not, in itself, constitute a ground for termination [of] parental rights.'" In re S.T.C., 165 S.W.3d 505, 516 (Mo.App. S.D. 2005) (quoting In re C.N.G., 109 S.W.3d 702, 707 (Mo.App. W.D. 2003)). Rather, it is only a factor to be considered in determining whether grounds for termination exist under § 211.447.4(3). Id. Based on the foregoing, we find the trial court's determination that parental termination was warranted because Father failed to rectify the conditions that brought C.A.L. under the jurisdiction of trial court was not based on substantial evidence. Point two is granted.
The court attempted to bolster its grounds for termination with bonding assessments conducted between Father and C.A.L. The bonding assessments, which were completed more than two years prior to the termination judgment, indicated that C.A.L. had become considerably attached to his foster family. This finding is only appropriate if we reach the best interests analysis. A trial court may reach the best interests analysis only after it has made a determination that one of the statutory grounds for termination exists. In Interest of M.H., 859 S.W.2d 888, 896 (Mo.App. S.D. 1993).[8] "Parental rights may not be severed because the child would be better off in another home." Id.
Our supreme court, in In re C.W., 211 S.W.3d 93 (Mo. banc 2007), recently discussed parental bonding in a similar situation and noted, "The finding that Mother and C.W. were not bonded, while relevant, is not surprising given that C.W. was removed from Mother's custody days after birth and that Mother was required to visit C.W. in a small room at the [C]hildren's [D]ivision's offices." Id. at 101. It found, however, that "Mother's attendance at the scheduled visits indicates that she was in fact bonded with C.W." Id. The court stated that it is almost a foregone conclusion that when a child is taken so early in his or her life that the bond with the biological *86 parent will not be as strong as it would otherwise be and instructed courts to take "into account this reality when passing judgment upon the bond between parent and child." Id. The court also noted, during its best interests analysis, that even though the mother and C.W. were "not strongly bonded, it is not readily apparent that such lack of bonding is Mother's fault" and the evidence that "she attended all of her scheduled visits" shows she has become increasingly involved in C.W.'s life. Id. at 102.
The same bonding situation is present in this case. C.A.L. was taken when he was around six months old. At the time of the termination hearing he had been in foster care for over three years.[9] It is "almost a foregone conclusion" that C.A.L. will not have as strong of a bond with Father as he otherwise would. However, Father's visitation with C.A.L. when financially able and commitment to his treatment plan indicates that he does have a bond with C.A.L. and is involved in C.A.L.'s life.
The judgment of the trial court is reversed.
PARRISH, J., SCOTT, J., concur.
NOTES
[1] Mother also appeals the termination of her parental rights. The appeals were not consolidated; however, the trial court did terminate both parents' rights at the same hearing. We have entered an opinion this date reversing the judgment terminating Mother's parental rights entitled In the Interest of C.A.L., Case No. SD28073. For a more comprehensive discussion of the facts, see Case No. SD28073.
[2] It appears from the record that C.A.L. continued to have problems gaining weight in foster care and was subsequently diagnosed as being "lactose intolerant." Father does not, however, challenge the initial finding of jurisdiction and we acknowledge the information only as it affects the analysis of the statutory grounds for termination.
[3] § 211.447. All references to statutes are to RSMo 2000, unless otherwise specified. S.B. 84, 94th Gen. Assem., 1st Reg. Sess. (Mo. 2007), which amends § 211.447, was enacted on June 21, 2007; however, for the purposes of this opinion we refer to the text and numbering of § 211.447 RSMo 2000, which was the section in effect at the time of the action involved in this case.
[4] There appears to be some confusion in the record as to where Father's February 2002 alcohol assessment was completed. Father testified that it was done through the Southwest Arkansas Drug and Alcohol Dependency Center, but Lisa Alford, an employee of the Children's Division, testified that it was done through South Central Missouri Rehabilitation.
[5] Father testified that from September 2002 until December 2004, he missed his biweekly visits with C.A.L. "maybe four times."
[6] At the April 15, 2005 hearing, Father testified that he was living alone in Gainesville, Arkansas.
[7] Dr. Bradford also evaluated Father, on November 17, 2003, but the Children's Division never received the report. As the actual report was not available, Dr. Bradford testified at the hearing based on his memory.
[8] An appellate court, like the trial court, can reach the issue of best interests of the child only after a determination that one or more of the statutory grounds for termination exist. In re T.A.S., 32 S.W.3d 804, 815 (Mo.App. W.D. 2000). Because we find that there was not substantial evidence before the trial court that, at the time of termination, grounds for termination existed, we need not reach the issue of whether termination was in the best interests of C.A.L.
[9] By the time the trial court entered its judgment terminating Father's parental rights, C.A.L. had been in foster care for approximately five years and six months making the delay in rendering a judgment after the hearing all the more regrettable.