**In The Interest of: L.M. and A.M., Minors,**

**R.J.M., Natural Father, Appellant,**

**v.**

**Phelps County Juvenile Office, Respondent.**

**Nos. SD 30082, SD 30083.**

Missouri Court of Appeals, Southern District, Division Two.

Sept. 20, 2010.

Nanci R. Wisdom, Salem, MO, for Appellant.

Frank B. Schweitzer, Salem, MO, for Respondent.

WILLIAM W. FRANCIS, JR., Judge.

R.J.M. ("Father") appeals the respective judgments terminating his parental rights to his minor children, L.M. and A.M. ("Children").[1] We affirm the judgments of the trial court.

**Factual and Procedural History**

" 'In reviewing a trial court's judgment terminating parental rights, we consider the facts and reasonable inferences therefrom in the light most favorable to the judgment.' " *In the Interest of L.M. and S.C.M.*, 212 S.W.3d 177, 180 (Mo.App. S.D. 2007) (quoting *In the Interest of A.M.F. and D.R.F.*, 140 S.W.3d 201, 203 (Mo.App. S.D.2004)). Viewed in this light, the facts and reasonable inferences therefrom follow.

H.M.B. ("Mother") is the natural mother of the Children. L.M. was born January 14, 2006, and A.M. was born July 7, 2004. Prior to May 2007, Father and Mother were together for approximately three to three-and-one-half years.

In late April or early May 2007, Mother left the household mobile home without any of her children, including her son from a prior relationship. Father returned that son to the son's natural father. Father then had the Children in his sole care for approximately thirty days. Mother visited periodically and supplied food utilizing the family food stamp card.

Toward the end of May 2007, Mother found the Children alone in the trailer. Father was at the landlord's house smoking marijuana. L.M. was strapped in a car seat and A.M. was moving about inside the trailer. The Children were screaming, very hungry, and thirsty. Father denied this incident. Mother then left with the Children and Father did not see or talk to Mother again until she testified at trial on January 9, 2009.

On June 7, 2007, Mother delivered the Children to the Phelps County Juvenile Office ("Juvenile Office"), where they were accepted under that court's jurisdiction. She stated the biological father had kicked her out of her home, she was concerned for the safety of the Children, and she could not care for the Children. The Children were very dirty with bug bites, diaper rash and dirty diapers. The Children were out of control, aggressive toward each other, and did not follow instructions. Mother told the Missouri Department of Social Services, Children's Division ("Children's Division") caseworker, Christine Abmeyer ("Ms. Abmeyer"), she did not know how to contact Father and that no one else was available to care for the Children. However, she did advise that Father worked at Hardee's in Rolla, Missouri.

That same day, the Children were placed in a foster home. However, they had to be moved within a few days because the foster parent could not handle their behavior with other children in the home. On June 11, 2007, the Children were placed in a second foster home. When the

1. The individual cases for each child were consolidated for this appeal. A petition was filed on behalf of each child and a separate judgment was entered with respect to each child.

Children were placed with this foster parent, they were aggressive towards each other, running around, yelling, hitting and biting. The foster parent also indicated the Children were constantly worried about getting enough to eat. They would guard and hoard their food, eat dog food and eat from the trash.

Ms. Abmeyer testified that after Mother left the Children, she attempted to contact Father at Hardee's and left a message for him. On Tuesday, June 19, 2007, she spoke with Father and informed him the Children were in the State's care. During that telephone conversation, Father identified himself as "R.J.M." and referred to the Children by their names. He also provided an address where he could be reached. Father advised he was not working Thursday or Friday and would come to her office to see her. He did not appear on either day. Ms. Abmeyer noted he did not request the Children be placed with him nor did he ask if he could visit the Children. Father denied having this conversation. Ms. Abmeyer also sent a letter to Father's address inviting him to the Family Support Team ("FST") meeting. The letter was not returned, but Father failed to appear at the "FST" meeting.

In September 2007, Phyllis Sickman ("Ms. Sickman"), a Children's Division caseworker, took over the case. In her efforts to locate Father, Ms. Sickman contacted jails in the area, prosecuting attorney offices, checked Missouri case.net, called Hardee's, sent a letter to Father's last known address, and screened for Social Security entries. She did not check with the Division of Child Support Enforcement. However, the Division of Child Support Enforcement sent Father the paternity test results for L.M. Father did not respond as he believed this was a result of Mother pursuing child support from him. The only indication of Father's efforts to locate the Children include his unsubstantiated claim that he asked H.M.B's mother in August 2007, and a mutual friend in September 2007, about the Children's location.

On May 14, 2008, the Juvenile Office filed a "Petition for Termination of Parental Rights" ("TPR") as to the Children.

On July 2, 2008, Father was informed by his mother that a notice to the parents for termination of parental rights of the Children was running in the local newspaper. After learning of the notice, Father began making phone calls inquiring about his Children. Father claimed he had not known where his Children were or how to contact them for over a year, since the end of May 2007, when Mother took the Children from him.

On July 8, 2008, Ms. Sickman returned a call to Father and informed him he had abandoned the Children, TPR had been filed, and he would need to hire an attorney or request one from legal aid. Father claimed he did not want his parental rights terminated. Ms. Sickman testified that during the phone call, Father did not inquire into the well-being of his Children, whether he could see them, or what he needed to do to get them back.

Father then hired attorney Nanci R. Wisdom who, on August 22, 2008, filed her entry of appearance on behalf of Father.

On August 28, 2008, Mother executed a "Consent to Termination of Parental Rights and Consent to Adoption" for both Children. On September 3, 2008, the court approved the consents.

On November 13, 2008, Father agreed to a written service agreement with Children's Division and completed some, but not all tasks required of him under that agreement. Father completed a psychological evaluation with Dr. Evelyn Darrow, but did not follow the recommendations of Dr. Darrow for individual counseling. He

completed some urinalysis drug testing, but failed to comply with an October 8, 2008 court order for a hair follicle drug test, until approximately three months later on January 5, 2009. As part of the written service agreement Father provided to Children's Division a timeline of his whereabouts since 2007. He called the Division of Child Support Enforcement one time to check on a support order and delivered six to ten gift baskets to Children's Division for the Children. Father attended all meetings requested of him.

Children's Division referred Father for a visiting assessment with Gary Evans, Ph. D., LCSW. Dr. Evans classified Father in a neglectful parent category and diagnosed him with avoidant personality disorder. Additionally, he testified the prognosis for Father becoming the principal and exclusive care provider for the Children ranged from "uncertain to poor." On January 24, 2009, Dr. Evans observed a visit between Father and the Children during which time the Children expressed no recognition of Father and no bond with him.

On March 11, 2009, a court order provided for visitation through the Assisted Custody Transition Program ("ACT Program"). In preparation for visitation, Father was also to be evaluated by Deborah McKee, Ph.D. On March 25, 2009, after not hearing from Father to set up a meeting, Dr. McKee's office called and left Father a message. On April 1, 2009, after Father did not respond, she called again. A meeting was then scheduled for April 6, 2009. Dr. McKee observed no bond between the Children and Father, and noted L.M. demonstrated discomfort in the presence of Father.

Father was married to B.M. on January 14, 1999, but was separated from her beginning in the summer of 2002 until January 1, 2008. Father lived several places between June 2007 and January 2008. After he reunited with B.M. in January 2008, they moved in with her mother and their long-term plan is to continue residing with her. A Children's Division caseworker found the condition of that home to be fine. Father contributes to household expenses by supplying food and paying toward utilities. Father has worked in the foodservice industry for the past several years and has a consistent work history.

Father and B.M. have two children. Father has another daughter who lives with her mother, and Father testified he has overnight visits with her approximately two weekends a month. However, B.M. testified that in the year and a half since their reconciliation, R.J.M. had not visited that daughter even though he knew where she was living because he was "incommunicado" with that daughter's mother. Father pays child support on the other daughter as well. At trial, Father was in arrears approximately $1,000 to $2,000 on the other daughter and was on probation in Newton County for those child support arrears. However, he was making payments and progress in the arrearage.

B.M. had a misdemeanor conviction for possession of marijuana in 2006. Since June 7, 2007, neither Father nor B.M. tested positive for illegal drugs. B.M. tested positive for benzodiazepines, but has a prescription for Xanax. On September 3, 2008, at the first team meeting Father attended, he tested positive for benzodiazepines, but does not have a prescription for that drug. He claimed he took a Xanax prescribed to B.M. to help him sleep.

On August 20, 2009, after hearing over five separate days of evidence, the trial court entered its judgments terminating Father's parental rights. This appeal followed.

Father contends the trial court erred in terminating Father's parental rights because the record failed to establish by

clear, cogent and convincing evidence that he abandoned, abused or neglected the Children, or that he failed to rectify the situation, or was unfit to be a party to the parent-child relationship, and that the evidence failed to establish by a preponderance of the evidence that termination is in the best interests of the Children. The Juvenile Office contends the evidence established grounds for termination and that it is in the Children's best interests.

The issues presented for determination are:

1. Did the record demonstrate one or more grounds for termination of the parental rights as set forth in section 211.447.5? [2]

2. Did the totality of circumstances show it was in the Children's best interests to terminate Father's parental rights?

## Standard of Review

■■■ "We defer to the fact-finding of the juvenile court and consider all evidence and reasonable inferences in the light most favorable to the judgment." *In re N.J.S.*, 276 S.W.3d 397, 400 (Mo.App. E.D.2009). "[T]he standard of proof may be satisfied even though the trial court has contrary evidence before it or evidence in the record might support a different conclusion." *In the Interest of A.K.F.*, 164 S.W.3d 149, 151 (Mo.App. S.D.2005).

■■■ A two-step analysis must be employed to decide whether to terminate parental rights. *In re L.M.*, 212 S.W.3d at 180. First, this Court must determine whether a statutory ground for termination has been proven by "clear, cogent, and convincing evidence." *In the Interest of S.J.H. and C.A.H.*, 124 S.W.3d 63, 66 (Mo.App. W.D.2004); § 211.447.6. This burden is met when the evidence "instantly tilts the balance in favor of termination

when weighed against the evidence presented by the parent whose rights are at issue." *Id.* at 66. "We will reverse a trial court's determination under this step only if it is unsupported by substantial evidence, is against the weight of the evidence, or it erroneously declares or applies the law." *In re L.M.*, 212 S.W.3d at 180–81.

■■■ If the first step is satisfied, the trial court progresses to the second step and determines whether the termination of parental rights is in the best interest of the child. *Id.* at 181; § 211.447.5. " 'The best interests prong must be proven by a preponderance of the evidence, and an appellate court reviews that ruling per an abuse of discretion standard.' " *Id.* at 181 (quoting *In the Interest of A.Y.M.*, 154 S.W.3d 412, 414 (Mo.App. S.D.2004)). The trial court's discretion is abused " 'when it is so clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.' " *In the Interest of D.M.B.*, 178 S.W.3d 683, 690 (Mo.App. S.D. 2005) (quoting *In re E.D.M.*, 126 S.W.3d 488, 497 (Mo.App. W.D.2004)).

■■■ "The termination of parental rights is an awesome power that involves fundamental liberty interests associated with family and child rearing." *In re L.M.*, 212 S.W.3d at 181 (citing *In re A.M.F. and D.R.F.*, 140 S.W.3d at 205). Therefore, "we review the record very closely to ensure this awesome power was properly exercised." *Id.* at 181.

## Analysis

### *Grounds for Termination of Parental Rights*

■■■ Father contends the trial court erred in terminating his parental rights

---

**2.** All references to statutes are to RSMo Cum. Supp. (2008), unless otherwise indicated.

because the judgments failed to establish by clear, cogent and convincing evidence Father: (1) abandoned the Children without good cause; (2) abused and neglected the Children; (3) failed to rectify his situation with his Children; and (4) is unfit to be a party to the parent-child relationship. The Juvenile Office contends clear, cogent and convincing evidence established grounds to terminate Father's parental rights on each ground. "Where the trial court finds multiple grounds for termination, any one of those grounds is sufficient to sustain the judgment." *In re N.R. W.*, 112 S.W.3d 465, 469 (Mo.App. W.D. 2003).

■ In the first portion of Father's contention, he argues he did not abandon his Children without good cause as they were involuntarily removed from his custody and he was not informed of where they were located until July 2008. The Juvenile Office contends Father abandoned his Children because he knew the Children's whereabouts and failed to provide any parental support for over a year. The issue for determination is whether clear, cogent and convincing evidence established Father abandoned his Children pursuant to section 211.447.5(1)(b) when he made no attempt to communicate with them from June 19, 2007 until July 2, 2008 despite knowing their whereabouts.[3]

■ Section 211.447 sets forth the framework for termination of parental rights including the grounds for termination. Section 211.447.5(1)(b) provides that the court may terminate parental rights when children over one year of age have been abandoned for a period of six months or longer at the time of filing the petition, and that "the parent has, without

good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so." This Court described "abandonment" as:

> [A] voluntary and intentional relinquishment of the custody of the child to another, with the intent to never again claim the rights of a parent or perform the duties of a parent; or . . . an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love, and his protection, maintenance, and the opportunity for the display of filial affection.

*In re Z.L.R.*, 306 S.W.3d 632, 635 (Mo.App. S.D.2010) (citing *In re E.F.B.D.*, 245 S.W.3d 316, 324 (Mo.App. S.D.2008)). " 'This largely presents an issue of intent, which is inferred from the parent's conduct.' " *Id.* at 635 (quoting *In re E.F.B.D.*, 245 S.W.3d at 324).

■ A finding of abandonment is not normally compatible with a finding that custody has ended involuntarily. *In re N.R.W.*, 112 S.W.3d at 469. "However, even when a child is involuntarily removed from a parent, the court may conclude that the child has been abandoned when 'a parent's lack of involvement goes beyond what is attributable to the estrangement and discouragement caused by the enforced separation.' " *Id.* at 469–70 (quoting *In re Z.H. v. G.H.*, 5 S.W.3d 567, 571 (Mo.App. W.D.1999)).

The record shows Father made no attempts to see his Children or communicate with them from June 19, 2007 until July 2, 2008, despite knowing they were in the State's care during this time. He also

---

**3.** The trial court's judgments cite section 211.447.5(2)(a), which addresses a mental condition interfering with child care; however, it is clear from the trial court's analysis that it intended to cite section 211.447.5(1)(b) because Father's mental condition was not a basis for termination of his parental rights. Father does not challenge this erroneous citation and the parties' briefs refer to section 211.447.5(1)(b).

made no attempt to provide financial or other support for the Children during that period. The trial court found "[c]redible evidence was presented that Father was provided with notice of the child[ren]'s placement in foster care." Furthermore, Father's testimony denying the July 19, 2007 telephone conversation with Children's Division and claiming someone impersonated him was found not credible. Father's attempted justification that he could not provide financial or other support for that extended period because he did not know where his Children were is negated by this finding. This Court defers to the fact finding of the trial court and considers all evidence and reasonable inferences in the light most favorable to the judgment. *In re N.J.S.*, 276 S.W.3d at 400. Father's willful absence in the Children's lives, without good cause, for over a year, provides clear, cogent and convincing evidence of Father's abandonment pursuant to section 211.447.5(1)(b). This evidence instantly tilts the balance in favor of termination when it is weighed against Father's evidence.

Even if this Court found evidence to support Father's contention that the Children were involuntarily taken from him when Mother left at the end of May 2007, Father received notification from Children's Division regarding the whereabouts of his children on June 19, 2007. This notification enabled him to make arrangements to visit or communicate with the Children. However, he chose to make no such arrangements and failed or refused to provide any financial, emotional or physical support to the Children during this time, even though he maintained consistent employment during this period. The trial court specifically considered this date in its finding of abandonment: "Father failed or refused to contact the minor child[ren] or Children's Division from June 19, 2007 until July 8, 2008." Father's intentional withholding of parental support without just cause constitutes abandonment. *See In re Z.L.R.*, 306 S.W.3d at 635. Thus, there was clear, cogent and convincing evidence that established a lack of involvement by Father which transcends any estrangement and discouragement that may have resulted if Mother involuntarily removed the Children from his care. *See In re N.R.W.*, 112 S.W.3d at 469–70.

Furthermore, Father's limited conduct to reconnect with his Children after July 2008, does not constitute repentance of abandonment. Abandonment can be repented "'only by the actual or attempted exercise of parental rights and duties following the abandonment.'" *In re E.F.B.D.*, 245 S.W.3d at 325 (quoting *In re J.W.*, 11 S.W.3d 699, 705 (Mo.App. W.D. 1999)). "However, whether there has been a repentance requires an examination of the parent's intent, an inferred fact, determined by considering all the evidence of the parent's conduct." *In the Interest of M.L.K.*, 804 S.W.2d 398, 403 (Mo.App. W.D.1991). It is well settled that a parent's post-filing conduct is often given little weight in determining repentance and cannot be the court's sole factor in finding repentance. *See In re J.W.*, 11 S.W.3d at 706 ("evidence of short-term improvements in a parent's circumstances which occur after the filing of the termination petition is not necessarily compelling[; ... ] a parent's post-filing conduct cannot be the sole factor in the court's determination of repentance"); *In the Interest of C.M.D.*, 18 S.W.3d 556, 563 (Mo.App. W.D.2000) (conduct after petition filed given little weight); *In the Interest of M.L.K.*, 804 S.W.2d at 403 (court may determine parent's efforts after termination petition were token despite the fact that contrary evidence exists). Here, any appearance of Father's repentance was after TPR was initiated. The trial court could have considered all of Father's post-filing actions (hiring an at-

torney, delivering gift baskets, partial compliance with social service plan, allowing the home of H.M.B.'s mother to be evaluated, and requesting the Children be placed in his custody) and still reasonably conclude there had been no repentance of the Children's abandonment. More significantly, Father's history with the Children demonstrates extended periods of no communication and a serious lack of commitment to the Children.

The evidence that was adduced instantly tilts the balance in favor of termination when weighed against the evidence presented by Father and demonstrates Father abandoned the Children.

Because our review directs us to affirm the trial court's judgments if the evidence supports any one of multiple grounds for termination, we need not address whether the record demonstrated Father abused and neglected the Children, failed to rectify the situation, or demonstrated he was unfit to be a party to the parent-child relationship. *See In re N.R. W.*, 112 S.W.3d at 469. The record demonstrated abandonment, which is one of the grounds for termination of parental rights as set forth in section 211.447.5. Father's first point is denied.

### *Best Interest Determination*

██ Father contends the preponderance of evidence did not support finding the termination of parental rights was in the Children's best interests in that Father is capable of caring for the Children and has made great efforts to have contact with his Children. The Juvenile Office contends there was no abuse of discretion because Father has demonstrated a lack of commitment to the Children and financial and emotional instability. Here, the issue is whether the totality of circumstances show it was in the Children's best interests to terminate Father's parental rights.

As stated above, after determining one or more of the statutory grounds for termination have been proven, the trial court must make a best interest determination. The best interest prong must be proven by a preponderance of the evidence, and the appellate court reviews that ruling for abuse of discretion. *In re L.M.*, 212 S.W.3d at 181. The trial court's discretion is abused " 'when it is so clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.' " *In the Interest of D.M.B.*, 178 S.W.3d 683, 690 (Mo.App. S.D.2005) (quoting *In re E.D.M.*, 126 S.W.3d 488, 497 (Mo.App. W.D.2004)).

Section 211.447.7 sets forth the factors for the court to evaluate and consider in deciding a child's best interest:

(1) The emotional ties to the birth parent;

(2) The extent to which the parent has maintained regular visitation or other contact with the child;

(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;

(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;

(5) The parent's disinterest in or lack of commitment to the child;

(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;

(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.

██ Determining the child's best interest is a subjective assessment based on the totality of the circumstances. *In the Interest of C.A.M.*, 282 S.W.3d 398, 409 (Mo. App. S.D.2009).

Here, the trial court considered each factor under section 211.447.7, and we conclude the trial court's findings are supported by the record.

In considering the first factor, the trial court's finding that the Children do not have any significant attachment to Father was established in the record, specifically the testimonies of Dr. Evans and Dr. McKee. Neither observed any bond between Children and Father.

The finding as to the second factor that Father has not maintained regular visitation or other contact with the Children was also supported by the record. Father made no effort to see the Children between June 2007 and July 2008. Even after he was granted court-ordered contact with the Children, he did not take full advantage of the opportunity to visit his Children and reestablish a connection. Dr. McKee had to make multiple calls to set up a visitation appointment.

██ Regarding factor three, the trial court noted Father failed to make any payments to offset the cost of care and maintenance of the Children even though he was consistently employed. The fact that he was awaiting an order for child support payment for the Children does not change the fact he failed to meet their daily needs for over a year. A parent is obligated to provide support even in the absence of demand for payment. *In re K.T.K. v. Crawford County Juvenile Office*, 229 S.W.3d 196, 202–03 (Mo.App. S.D. 2007).

Next, the trial court evaluated factor four and concluded additional services would not likely bring about lasting parental adjustment enabling a return of the Children to Father within an ascertainable period of time. This is also supported by the record, specifically the "uncertain to poor" prognosis for Father being able to be the principal care provider. Additional support for this conclusion is the fact that when his Children came into care, they were undisciplined, wild, and aggressive toward each other, suggesting a failure to parent. The record indicates after receiving appropriate structure and parenting from their foster parent, the children are well-behaved, respectful of other's personal boundaries, able to articulate their needs and desires and are "smiling children who love to play."

Key to the trial court's decision was the finding of factor five—Father's disinterest in or lack of commitment to the Children. The trial court elaborated on the subjective and objective evidence in support of this factor and concluded Father "has *no* interest in raising these children." Significantly, Father knew his Children were in Children's Division custody for over a year and did nothing. Additionally, Father's failure to maximize contact with his Children during his participation in the ACT Program reflects his non-desire to be a parent.

In evaluating factor six, the trial court noted Father had no felony convictions that would deprive the Children of a stable home.

Finally, in regard to factor seven, evidence demonstrated deliberate acts of Father subjecting the Children to substantial risk of physical or mental harm, including leaving the Children alone in the home while smoking marijuana and failing to contact them or provide any support for

over a year. The record supports the trial court's finding as to this factor.

The limited conduct Father asserts to support his contention (delivering gift baskets, compliance with a social service plan, acting appropriately during visitation) are generally token gestures that do not demonstrate a strong desire to be a parent, nor do they offset the continued pattern of abuse and neglect. Section 211.447.8 makes clear the trial court "may attach little or no weight to infrequent visitations, communications, or contributions." *See also In re C.A.M.*, 282 S.W.3d at 409. We agree with the trial court's emphatic finding that Father's conduct is not indicative of someone who wants to be a "Dad." The continuation of this parent-child relationship will deprive the Children of an opportunity for a stable and permanent home.

In viewing the totality of circumstances, there is a sufficient record for the trial court to conclude by a preponderance of the evidence that it was in the Children's best interests to terminate Father's parental rights. There is no showing the trial court's finding is against the logic of the circumstances and so unreasonable as to indicate a lack of careful consideration. Father's second point is denied. There is no showing the trial court's judgments are unsupported by substantial evidence, against the weight of the evidence, or erroneously declare or applies the law. The judgments of the trial court are affirmed.

SCOTT, C.J., and RAHMEYER, P.J., concur.