**In the Interest of C.A.L., a child under seventeen years of age.**

No. 28073.

Missouri Court of Appeals, Southern District, Division One.

July 3, 2007.

James R. Sharp, Springfield, for Appellant.

William C. Prince, Springfield, for Respondent Greene County Juvenile Office.

Linda K. Thomas, Springfield, for Minor.

NANCY STEFFEN RAHMEYER, Presiding Judge.

On December 12, 2005, the trial court entered an order, which stated:

The court has had this case under advisement waiting suggestions and other matters for a lengthy period of time because of the issues in this case. The court has read the cases that have been written by the Missouri Supreme Court, by the Court of Appeals, concerning termination of parental rights.

In those cases, the courts have stated and required that abuse or neglect sufficient to support termination under section 211.447.4(2); be based on conduct at the time of termination not just at the time jurisdiction was initially taken. In the [I]nterest [of] K.A.W.[,] 133 [S.W.3d] 1, 10 (Mo[.] banc 2004). Past behavior can support grounds for termination, but only if it is convincingly linked to predicted future behavior. Id. at 9–10.

In reviewing this case, this child was initially removed from the mother for a failure to thrive because the newborn was not gaining weight, in fact, was loosing [sic] weight. The Children's Division believed that this was a failure on the part of the mother to get the proper medical treatment, and/or to properly care for her child. There was evidence in the case that even after the child went in to Children's Division custody that the child continued to lose weight, until it was determined a few days or weeks later that the child was lactose intolerant, and needed to be put on a milk-free formula. The child also under went a medical procedure and based upon those factors, the child began gaining weight.

The child was not returned to the mother because of issues that she was not following the treatment plan, as prescribed by the Children's Division, and had gotten into verbal and physical altercations with a worker a few years ago. The court is aware that the mother has not been a willing participant in the treatment plan throughout her time. However, the court was struck by the fact that this mother had two other children that were older than the baby removed at one time, and then placed back with this mother while this case was pending.

Now, the troubling part for the court is that a bonding study has been done, and this child has not been with its mother in any real sense, since April 1st, 2001. The bonding study indicated that this child is not bonded with his mother. However, I could find that in the best interest of the child, since he is not bonded with the mother her rights should be terminated and the child's rights should be terminated to have access to his parent. The problem as I see it is, this child should have been reunified with his mother years ago. If you solely went on the best interest of the child irregardless of the actions of the parents and the Children's Division, you might argue since this child is bonded with its current foster placement, that it would be extremely detrimental to the child. However, in my reading of the cases and the Statu[t]e, I do not believe that I can terminate parental rights by making a finding that irregardless of the behavior of the mother and/or her lack of commitment to a treatment plan, and of lack of action of the Children's Division, that the parental rights can be terminated, not for any actions that brought the child into custody, or that continued during the custody, or our link to any future conduct.

However, the Court does grant the petition for termination of parental rights. The Court does reluctantly grant the petition because of the length

of time and the bonding the child has with the foster parents, and the length of time the child has not been with the mother.

The Greene County Juvenile Office ("Respondent") filed a motion to set aside that order, which was granted, and approximately nine months later, on September 14, 2006, the court entered an amended order terminating the parental rights of C.A.L.'s mother, L.W. ("Mother"). The amended and final order, which was based on the statutory grounds of neglect and failure to rectify,[1] was entered with no further evidence. Mother appeals that determination on the basis that substantial evidence does not support either ground.[2] We agree and reverse the judgment.

## FACTS

C.A.L. was born on September 26, 2000, with a partial cleft lip and palate. When C.A.L. was born, Mother had two other children, N.W. and D.W.[3] While C.A.L. was living with Mother in Oregon County, the Children's Division received a hotline call claiming that C.A.L. was failing to thrive. Specifically, C.A.L. had low weight and instead of gaining weight there was a possibility he was losing weight. On March 3, 2001, after moving to Greene County, C.A.L. was hospitalized for pneumonia. This resulted in another hotline call concerning C.A.L.'s failure to thrive

and loss of weight. After being dismissed from the hospital on March 7, 2001, C.A.L. was to be weighed weekly and have weekly doctor's visits.

On March 27, 2001, Mother took C.A.L. to be weighed at the Women, Infant and Children's ("WIC") Office. The scale indicated that C.A.L. had gained one pound. However, C.A.L.'s primary physician expressed concern that C.A.L. was not weighed on the scale in her office because of possible variations in the scales.

On March 28, 2001, C.A.L. was placed in protective custody. On March 29, 2001, Respondent filed a petition claiming C.A.L. was without adequate and proper care, custody, support, supervision and parenting, and the welfare of C.A.L. was endangered by his failure to thrive due to parental neglect, specifically the parents' failure to follow through with the necessary medical appointments for C.A.L. The trial court subsequently found the allegations in the petition to be true[4] and, pursuant to § 211.031.1(1), found that it had jurisdiction over C.A.L. and ordered that temporary legal custody of C.A.L. be placed with the Children's Division for appropriate placement.

On July 2, 2001, the trial court approved and ordered a treatment plan whereby Mother would: provide and maintain a

1. § 211.447. All references to statutes are to RSMo 2000, unless otherwise specified. S.B. 84, 94th Gen. Assem., 1st Reg. Sess. (Mo. 2007), which amends § 211.447, was enacted on June 21, 2007; however, for the purposes of this opinion we refer to the text and numbering of § 211.447 RSMo 2000, which was the section in effect at the time of the action involved in this case.

2. Father also appeals the termination of his parental rights. The appeals were not consolidated; however, the trial court did terminate both parents' rights at the same hearing. We have entered an opinion this date reversing the judgment terminating Father's parental

rights entitled *In the Interest of C.A.L.*, Case No. SD28114.

3. At the time of the termination hearing, N.W. was 11 years old and D.W. was 9 years old.

4. It appears from the record that C.A.L. continued to have problems gaining weight in foster care and was subsequently diagnosed as being "lactose intolerant." Mother does not, however, challenge the initial finding of jurisdiction and we acknowledge the information only as it affects the analysis of the statutory grounds for termination.

stable place of residence; inform the Children's Division of any changes in address and household composition; sign releases of information forms; visit C.A.L. a minimum of two times per month; be gainfully employed or have lawful means of steady income; attend parenting classes; cooperate in obtaining a psychological evaluation and follow any recommendations; attend and participate in individual and/or family counseling as recommended by the Children's Division; and attend and participate in all scheduled medical appointments for C.A.L. This agreement stated that "failure to comply with conditions and terms of this plan may result in the filing of a petition to terminate parental rights."

On March 11, 2002, the Children's Division assumed physical and legal custody of N.W. and D.W., Mother's other children, and placed them in foster care. In May 2004, after participating in family therapy, N.W. and D.W. were returned to Mother and their case has been closed. Mother gave birth to another child, T.W.,[5] on November 21, 2002, who has remained in Mother's custody.

On April 30, 2002, Respondent filed a petition to terminate the parental rights of Mother. The petition alleged in relevant part that Mother abused and/or neglected C.A.L.; that C.A.L. has been under the jurisdiction of the juvenile court for a period of one year and the conditions which led to the assumption of jurisdiction still persist and there is little likelihood that those conditions will be remedied at an early enough date so that C.A.L. can be returned to Mother; that Mother has not complied with the terms of her treatment plan; and that it would be in the best interest of C.A.L. to terminate Mother's parental rights. Over two years after the filing of the petition for termination, the trial court heard testimony and received evidence regarding these allegations on December 2 and 3, 2004, and January 18, March 16 and 17, and April 15, 2005.

## Standard of Review

The termination of parental rights is an awesome power that involves fundamental liberty interests associated with family and child rearing. *In re A.M.F.,* 140 S.W.3d 201, 205 (Mo.App. S.D.2004). For that reason we review the record very closely to ensure this awesome power was properly undertaken. *Id.* In deciding whether to terminate parental rights a trial court must employ a two-step analysis. *In re S.J.H.,* 124 S.W.3d 63, 66 (Mo.App. W.D. 2004).

The first step involves determining whether a statutory ground for termination has been proven by "clear, cogent, and convincing evidence." *Id.;* § 211.447.5. "Clear, cogent and convincing evidence is that which 'instantly tilts the scales' in favor of termination when weighed against the evidence presented by the parent whose rights were terminated." *A.M.F.,* 140 S.W.3d at 205 (Mo.App. S.D. 2004) (quoting *In the Interest of C.L.W.,* 115 S.W.3d 354, 355–56 (Mo.App. S.D. 2003)). We will reverse a trial court's determination under this step only if it is unsupported by substantial evidence, is against the weight of the evidence, or it erroneously declares or applies the law. *S.J.H.,* 124 S.W.3d at 66. Only if the first step is satisfied does the trial court move on to the second step to determine whether the termination of parental rights is in the best interest of the child. *Id.;* § 211.447.5. That determination is re-

---

**5.** After scouring the record we are unable to ascertain evidence of T.W.'s surname. For purposes of this opinion we will assume that he took Mother's surname. At the time of the termination hearing, T.W. was 2 years old.

viewed for an abuse of discretion. *S.J.H.,* 124 S.W.3d at 66.

### § 211.447.4(2)—Abuse and Neglect

▮ The court found that the statutory ground found in § 211.447.4(2) was met in that Mother neglected the child. In so finding, the trial court made the statutorily required findings in § 211.447.4(2). "Proof of any one of these factors is sufficient to terminate parental rights." *In re C.F.C.,* 156 S.W.3d 422, 427 (Mo.App. E.D.2005). The court found that Mother did not suffer from a mental condition rendering her unable to knowingly provide for C.A.L. § 211.447.4(2)(a). While it found that Mother had a history of drug usage, specifically methamphetamine, no evidence was presented that Mother had a current chemical dependency which would prevent her from providing for C.A.L. which could not be treated. § 211.447.4(2)(b). The court further made a finding that there was no evidence that Mother abused C.A.L. in any way. § 211.447.4(2)(c). The only factor the trial court found that warranted its finding that Mother neglected C.A.L. was finding Mother repeatedly and continuously failed, although physically and financially able, to provide C.A.L. with adequate food, clothing, shelter, or education as defined by § 211.447.4(2)(d).

▮ The court's first finding, pursuant to § 211.447.4(2)(d), was that Mother failed to provide financial support for C.A.L. that was more than token in nature. It stated that no evidence was presented that Mother had provided any regular financial or in-kind support for C.A.L. while he was in foster care, but she did bring C.A.L. a snack and beverage when she visited and brought him toys and articles of clothing on special occasions such as birthdays or holidays. The issue under § 211.447.4(2)(d) is whether Mother has fulfilled her affirmative duty to support, communicate with, and visit C.A.L. *In re S.M.H.,* 160 S.W.3d 355, 367 (Mo. banc 2005). The supreme court further explained:

> If a parent is unable to pay for all of a child's financial needs, he or she has a duty to provide as much as he or she reasonably can. Evidence that a parent has provided some contribution, even if not fully sufficient for support, demonstrates the parent's intent to continue the parent-child relationship and militates against termination.

*Id.* (internal citations omitted). Furthermore, a parent's failure to provide financial support for a child while he or she is in foster care must indicate that the parent would be unable to provide adequate food, clothing, or shelter to a child in parent's physical custody in the future. *C.F.C.,* 156 S.W.3d at 428–29.

Mother claims her failure to make financial contributions during the time C.A.L. was in foster care does not cast doubt on her future ability to provide for C.A.L. After C.A.L. was placed in foster care Mother was unemployed for a year and a half because she was hospitalized with kidney problems after the birth of her youngest son, T.W., and was on Temporary Assistance to Needy Families ("TANF") during that period. After that she had a variety of jobs until March or April 2004, when she became employed, and was still employed at the time of the hearing, at Unifirst making $6.15 per hour. Mother is supporting three other children on this income. Mother's steady employment and ability to support three other children does not support the finding that she would be unable to provide financially for C.A.L. in the future. We do not find substantial evidence supports the finding on the first factor.

The trial court also found that Mother failed to consistently visit C.A.L. while he

was in foster care due to the fact that she was incarcerated. However, it found that when she was not incarcerated she visited consistently. Both parties agree that this statement is accurate. The evidence indicates that Mother was incarcerated at least twice in 2002—once between February 22 and 25, 2002, and again between March 11 and April 24, 2002—and was possibly incarcerated a third time during the first week of June 2002. In the four years since that time, Mother visited consistently and regularly. Her failure to visit while incarcerated in the past does not support a finding of neglect. Rather, her consistent visitation when she was able to do so shows her commitment to C.A.L.

The trial court further found that Mother's unstable lifestyle negatively affected her ability to provide C.A.L. with the necessary care, custody, and control. It states that Mother's hostile behavior and excessive anger have placed her in a position where she has had encounters with law enforcement. The trial court summarized Mother's hostile behavior as follows:

> [Mother] kicked a Deputy Juvenile Officer and resisted arrest in an adjoining county. The investigative worker in this case described the anger of [Mother] as the worst that she had seen in her four years as an investigative worker and two psychologists noted that [Mother] had anger management issues. She behaved in a threatening manner toward a Deputy Juvenile Officer, her case manager with the Children's Division . . . and other individuals associated with [C.A.L.'s] case. She made statements about placing pipe bombs under vehicles and statements about hacking into the computer system of the Children's Division in order to gain information she desired. She was also observed driving by [C.A.L.'s] foster home which resulted in the foster parent restricting the ability of [C.A.L.] and her own children to be

outside unsupervised. The behavior of [Mother] was also disruptive in the foster parent's place of worship.

Mother does not dispute that these events occurred. Instead, she claims that her anger towards the Children's Division and Respondent was justified given they would not return C.A.L. to her but she understands that her actions were inappropriate.

 Mother's past actions and anger problems are not sufficient to find termination is warranted under § 211.447.4(2). Again, all of these actions occurred in the distant past. "An essential part of any determination whether to terminate parental rights is whether, considered at the time of the termination and looking to the future, the child would be harmed by a continued relationship with the parent." *In re K.A.W.*, 133 S.W.3d 1, 9 (Mo. banc 2004).

> [I]t is insufficient merely to point to past acts, note that they resulted in abuse or neglect and then terminate parental rights. Past behavior can support grounds for termination, but only if it is convincingly linked to predicted future behavior. There must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm.

*Id.* at 9–10 (internal citations omitted). Also, evidence of abuse or neglect sufficient to support termination must "be based on conduct at the time of termination, not just at the time jurisdiction was initially taken." *Id.* at 10.

Since the time of these occurrences, Mother has made considerable ground in managing her anger through her family therapy with Kathy Weber and has not had any criminal problems since 2002. Nothing in the record shows that Mother's "conduct at the time of termination" warrants termination. *Id.* In fact, nothing in

the record speaks to circumstances that existed at the "time of termination." This is partly because of the immense delay between the hearing of evidence and the date of termination. It is further exacerbated that all of the psychological exams and testimony concerned behavior that was at least two years old at the time of the hearing. As noted, the petition was filed in 2002, the evidence was heard by the trial court on six days starting December 2, 2004, and ending April 15, 2005, and the final judgment did not occur until September 14, 2006. Therefore, the judgment does not reflect in any way an understanding of Mother's conduct and circumstances "at the time of termination."

Based on the foregoing, we find the trial court's determination that parental termination was warranted because Mother neglected C.A.L. was not based on substantial evidence. Point one is granted.

### § 211.447.4(3)—Failure to Rectify

■ In her second point, Mother claims the trial court erred in finding, as a ground for terminating her parental rights pursuant to § 211.447.4(3), that the conditions that led to the assumption of jurisdiction still persist and that there is little or no likelihood that those conditions will be remedied at an early date because this finding was not based on substantial evidence and was against the weight of the evidence. This ground for termination is commonly referred to as "failure to rectify." "Termination for failure to rectify under [§ ] 211.447.4(3) must be based on a determination that potentially harmful conditions continue to exist at the time of termination, not just that the conditions that led to jurisdiction persist." *In re K.W.,* 167 S.W.3d 206, 214 (Mo.App. E.D. 2005).

The petition asking the trial court to assume jurisdiction over C.A.L. stated that C.A.L. was endangered by his failure to thrive due to parental neglect. It also stated that the "biological parents have been offered services from the [Children's Division] and have failed or neglected to follow through with such services and have demonstrated an unwillingness to cooperate with the [Children's Division]." The court found these allegations persuasive and assumed jurisdiction over C.A.L. Lisa Alford, a caseworker with the Children's Division, testified that when this case was first opened the initial case goal was reunification. The concerns that needed to be addressed were: C.A.L.'s medical issues, Mother's anger issues, domestic violence issues, and issues relating to providing a stable home and environment.

■ In finding that Mother failed to rectify these conditions the trial court made the statutorily required findings pursuant to § 211.447.4(3). It discussed the treatment plan Mother entered into with the Children's Division and the extent to which she made progress in complying with the terms of the plan. § 211.447.4(3)(a). It is important to note that " '[A] parent's failure to comply with a written service agreement does not, in itself, constitute a ground for termination [of] parental rights.' " *In re S.T.C.,* 165 S.W.3d 505, 516 (Mo.App. S.D.2005) (quoting *In re C.N.G.,* 109 S.W.3d 702, 707 (Mo.App. W.D.2003)). Rather, it is only a factor to be considered in determining whether grounds for termination exist under § 211.447.4(3). *Id.*

Mother's first responsibility under the treatment plan was to provide and maintain a stable place of residence. Evidence was presented at trial, and the trial court found, that Mother was currently living in an apartment which met minimal community standards.

Mother's second responsibility was to not allow people to frequent or visit her household who would pose a threat to her children. Mother used to live with C.A.L.'s father, who had a history of domestic abuse. She no longer lives with C.A.L.'s father but does maintain some contact with him.

The treatment plan stated that Mother was to report changes in address and her household composition to the Children's Division. The trial court found that Mother did not report changes in her household composition and did not inform them when other people stayed in her house. However, nothing in the record indicates what changes in household composition Mother failed to report with the exception of Ms. Alford's testimony that "individuals [ ] have resided in [Mother's] household on a temporary basis or stayed in the household who [she did] not have information on to determine whether or not they would pose a threat." Respondent states this finding concerns Mother's general lack of cooperation with the Children's Division but that is not what the judgment states. We, therefore, find that nothing in the record supports the trial court's finding that Mother failed to report changes in household composition.

Mother was to sign release of information forms. Though she initially refused, Mother eventually signed those forms. The plan provided that Mother was to visit C.A.L. a minimum of twice per month. As previously discussed, other than when she was incarcerated, Mother consistently visited C.A.L.

Mother was to obtain gainful employment or have lawful means of steady support. After C.A.L. was placed in foster care, Mother was unemployed for a year and a half because she was hospitalized with kidney problems after the birth of her youngest son and was on TANF during that period. After that she had a variety of jobs until March or April 2004, when she became employed, and was still employed at the time of the hearing, at Unifirst making $6.15 per hour.

Mother was to attend and participate in all scheduled medical appointments for C.A.L. Mother did attend these medical appointments until the Children's Division suspended her participation due to her allegedly disruptive and inappropriate behavior. Mother's ban from medical appointments had not been lifted at the time of the hearing, therefore, Mother could not comply with that provision of the service plan.

Finally, the treatment plan stated that Mother was to attend parenting classes, obtain a psychological evaluation and follow the recommendations of the therapist, and attend and participate in individual and/or family counseling. Two psychological evaluations were performed on Mother. Dr. Lane Andelin, in July 2001, diagnosed Mother with an adjustment disorder with mixed disturbance of emotions and conduct, along with histrionic, narcissistic, and possible anti-social traits. He indicated that she needed individual therapy to work on her anger and interpersonal issues. Dr. Mark Bradford, in December 2003, diagnosed Mother with a mixed personality disorder with histrionic, narcissistic, and anti-social traits. Dr. Bradford indicated that Mother needed around two to three years of individual therapy to deal with this problem but noted that it was not impossible for a parent with this disorder to effectively parent a child.

While it is unclear whether Mother received individual therapy, it is certain she received "family therapy" and parenting lessons from Ms. Weber. In February 2003, Mother began family therapy with Ms. Weber, a counselor with Southwest Missouri Counseling Service. Ms. Weber

became involved in family therapy with Mother as a result of N.W. and D.W. being placed in foster care. Ms. Weber noted that she reviewed Dr. Bradford's psychological evaluation and found that Mother's personality disorder manifested itself in the anger and extreme hostility Mother had shown the Children's Division. Specifically, she noted that Mother has "been extremely hostile towards [the Children's Division] personnel, resistant to try and make some of the changes that they requested, because she felt that her children were taken unfairly[.]" Ms. Weber then began working on decreasing the amount of anger Mother felt. She testified that Mother's "hostility toward the [Children's Division] is still there, but she's been cooperative with me." Ms. Weber noted that at the beginning of family therapy Mother was hostile towards her, but now Mother is not hostile to her and after the therapy she no longer sees "[Mother] getting as angry."

Mother's psychological conditions, found by Drs. Andelin and Bradford, are insufficient to warrant termination. As stated, a trial court's decision to terminate Mother's parental rights for failure to rectify must be based on a determination that potentially harmful conditions continue to exist at the time of termination. *K.A.W.*, 133 S.W.3d at 10. The one year and five month delay between the last day of trial and the final judgment terminating Mother's parental rights makes it impossible for the trial court to know if Mother rectified any of the conditions which led to the assumption of jurisdiction. Dr. Andelin conducted his psychological evaluation in July 2001, and Dr. Bradford conducted his in December 2003. Neither evaluation sheds any insight into Mother's psychological condition at the time of termination, especially considering the therapy she has participated in with Ms. Weber.[6] Further, it is not clear how these psychological evaluations show any possible future harm to C.A.L. in light of the trial court's finding that no evidence was presented that a mental condition rendered Mother unable to knowingly provide C.A.L. with the necessary care, custody and control. § 211.447(3)(c).

Finally, the trial court also found that, due to Mother's neglect and instability, the Children's Division and Respondent had failed in their efforts to aid Mother in adjusting her circumstances and conduct to provide a proper home for C.A.L. § 211.447.4(3)(b). There is no substantial evidence supporting this finding. Mother is not unstable or neglectful. She has consistently visited C.A.L., has consistent employment, and has a stable residence that meets minimum standards. Further, Ms. Weber's testimony that Mother has shown improvement with both parenting and anger management since beginning family therapy shows that the Children's Division has aided Mother.

■ In an independent finding, the trial court placed considerable emphasis on a bonding assessment conducted that indicated that C.A.L. has become considerably attached to his foster family and that removing him would have physical and emotional effects on him. This is not surprising considering he has spent the majority of his life in foster care; however, this finding is not relevant in supporting grounds for termination. This finding is only appropriate if we reach the best interests analysis. The trial court ostensibly uses this finding to bolster the grounds for termination by stating, "[Mother has] not

6. We note that Dr. Bradford testified that "[Ms. Weber was] an excellent choice of therapy for [Mother]."

demonstrated the ability to meet the needs of [C.A.L.] by providing him with the structure and stability the mental health professionals who conducted the bonding assessment recommended that [C.A.L.] have." A trial court may reach the best interests analysis only after it has made a determination that one of the statutory grounds for termination exists. *In Interest of M.H.*, 859 S.W.2d 888, 896 (Mo.App. S.D.1993). "Parental rights may not be severed because the child would be better off in another home." *Id.*

Even if it were appropriate for a trial court to consider a bonding assessment in determining if grounds for termination exist, the two bonding assessments used in this case do not constitute substantial evidence.

In December 2003, Dr. Bradford conducted a bonding assessment. He testified:

> [Mother] admitted it's very difficult to be bonded to a child that she's had no time with. And I think ... the results are that ... the biological parents [ ] are more acquaintances to [C.A.L.] than actual parents. And that's not unexpected considering the child had been out of the home so very long.
>
> . . . .
>
> [C.A.L.] was not bonded to [Mother.] [C.A.L.] was bonding to the foster parents. And I would say in [Mother's] defense she was in no way inappropriate with [C.A.L.]. She was appropriate in the way of [C.A.L.].
>
> . . . .
>
> [C.A.L.] seemed to think the foster parents were the parents.

Dr. Bradford said every day C.A.L. was away from Mother makes it harder to move him back.

In May 2004, Dr. Steinberg conducted another bonding assessment. He noted that there was no tender touching between Mother and C.A.L., which bothered him. He stated that C.A.L.'s real attachment was to the foster parents not to Mother. Specifically, C.A.L. refers to his foster parents as "mom" and "dad" and the foster parents' children as his brothers and sisters. In Dr. Steinberg's opinion, Mother exhibited a real concern for C.A.L. but was not bonded to him. He did, however, acknowledge that it is almost impossible for a parent and child to develop a bond when a child has been in foster care for a lengthy period of time.

These two bonding assessments took place more than two years prior to the September 14, 2006 termination. They, therefore, suffer from the same problems discussed above in that there is no evidence showing the bond present between Mother and C.A.L. at the time of termination. However, even if the bond at the time of termination was as the bonding assessments indicated, this fact is not surprising and is not sufficient evidence to warrant termination.[7]

Our supreme court, in *In re C.W.*, 211 S.W.3d 93 (Mo. banc 2007), recently discussed parental bonding in a similar situation and noted, "The finding that Mother and C.W. were not bonded, while relevant, is not surprising given that C.W. was removed from Mother's custody days after birth and that Mother was required to visit C.W. in a small room at [C]hildren's [D]ivision's offices." *Id.* at 101. However, it

---

7. There is evidence present that Mother's bond with C.A.L. is stronger than that indicated in the bonding assessments. For instance, Ms. Alford testified on March 16, 2005, that Mother and C.A.L. have "some form of rela-

tionship." She also indicated that C.A.L. sometimes refers to Mother as "mom" and occasionally he will voluntarily give Mother a hug or kiss.

found that "Mother's attendance at the scheduled visits indicates that she was in fact bonded with C.W." *Id.* The court stated that it is almost a foregone conclusion that when a child is taken so early in his or her life that the bond with the biological parent will not be as strong as it would otherwise be and instructed courts to take "into account this reality when passing judgment upon the bond between parent and child." *Id.* It also noted, during its best interests analysis, that even though the mother and C.W. were "not strongly bonded, it is not readily apparent that such lack of bonding is Mother's fault" and the evidence that "she attended all of her scheduled visits" shows she has become increasingly involved in C.W.'s life. *Id.* at 102.

The same bonding situation is present in this case. C.A.L. was taken when he was around six months old. At the time of the termination hearing he had been in foster care for over three years.[8] It is "almost a foregone conclusion" that C.A.L. will not have as strong of a bond with Mother as he otherwise would. However, Mother's consistent visitation with C.A.L. indicates that she does have a bond with C.A.L. and is involved in C.A.L.'s life.

Based on the foregoing, we find the trial court's determination that parental termination was warranted because Mother failed to rectify the conditions that brought C.A.L. under the jurisdiction of the trial court was not based on substantial evidence. Point two is granted.

### Best Interests of the Child

 In her third point, Mother claims the trial court abused its discretion in finding termination was in the best interests of C.A.L. An appellate court, like the trial court, can reach the issue of best interests

of the child only after a determination that one or more of the statutory grounds for termination exist. *In re T.A.S.*, 32 S.W.3d 804, 815 (Mo.App. W.D.2000). Because we find that there was not substantial evidence before the trial court that, at the time of termination, grounds for termination existed, we need not reach the issue of whether termination was in the best interests of the child.

The judgment of the trial court is reversed.

PARRISH, J., SCOTT, J., concur.

---

8. By the time the trial court entered its final judgment terminating Mother's parental rights, C.A.L. had been in foster care for approximately five years and six months making the delay in rendering a judgment after the hearing all the more regrettable.