

# In the Missouri Court of Appeals
# Eastern District
## DIVISION TWO

| | | |
|---|---|---|
| IN THE INTEREST OF T.M.P.: | ) | No. ED109843 |
| | ) | consolidated with ED109844 |
| | ) | |
| | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| | ) | Cause No. 2022-JU00472 & 2022-JU00473 |
| | ) | |
| | ) | Honorable Barbara T. Peebles |
| | ) | |
| | ) | Filed: April 5, 2022 |

## OPINION

M.C. (Mother) appeals the trial court's judgment terminating her parental rights under § 211.447.5(2) (abuse and neglect), § 211.447.5(3) (failure to rectify), and § 211.447.5(5) (unfitness).[1] Mother argues the court's findings and judgment regarding Mother's failure to support her children, obtain adequate housing, and comply with the requirements of the court-ordered social service plan were against the weight of the evidence. We agree and reverse the trial court's judgment because the Missouri Department of Social Services, Children's Division failed to present substantial evidence justifying the court finding in favor of parental termination.

Factual and Procedural Background

On February 16, 2018, the Missouri Department of Social Services, Children's Division (the Division) took the two minor children, T.M.P. (born April 20, 2013) and T.T.P. (born July

---

[1] All statutory references are to RSMo. 2018 unless otherwise indicated.

13, 2015), into custody following various allegations affecting their health and safety, including unsanitary conditions in the home.

On March 23, 2018, the trial court transferred legal custody of the minor children to the Division and ordered the parents to comply with the court-ordered social service plan following a hearing under Cause Nos. 1822-JU00109 and 1822-JU00110, the abuse and neglect matters. Specifically, the court ordered Mother to (1) visit regularly with the children, (2) obtain and maintain financial stability or regular employment, (3) obtain and maintain appropriate housing with working utilities, (4) successfully complete parenting skills training, (5) successfully complete individual therapy and (6) submit to a psychological evaluation with a parenting assessment and comply with any recommended treatment.

The minor children were in the custody of the Division for more than a one-year period when the Division filed its Petition to Terminate Parental Rights of both Mother and the minor children's natural father, T.P.[2] More specifically, the Division alleged: Mother failed to provide adequate food, clothing, shelter, and education pursuant to § 211.447.5(2)(d) (abuse and neglect); the conditions triggering the court's jurisdiction over the minor children continued for more than a one-year time period and were unlikely to be rectified under § 211.447.5(3) (failure to rectify) and, finally, Mother is unfit to be a party to the parent and child relationship pursuant to § 211.447.5(5) (unfitness). Further, the Division alleges that it is in the best interests of the minor children to terminate Mother's parental rights under § 211.447.7 (child's best interests).

As a basis for requesting termination, the Division alleges a range of unsatisfactory conditions affecting the safety of the home and that Mother is incapable of financially supporting the minor children because she does not work and lacks an income.

---

[2] This appeal addresses the termination of Mother's parental rights only. The natural father consented to the court terminating his parental rights following the termination trial but before the juvenile court entered its judgment.

2

At the May 13, 2021 termination trial, the trial court heard and received evidence as well as took judicial notice of the underlying abuse and neglect actions and the termination of parental rights matters. When presenting evidence, the Division called the family case manager (Case Manager) and the deputy juvenile officer (DJO) assigned to the case. Mother testified on her behalf as well.

The Case Manager addressed Mother's performance under the six provisions of the previously entered court-ordered social service plan pursuant to § 211.447.5(3)(a). The Case Manager testified that she complied with the first provision, visitation, stating Mother consistently visited the children in person prior to the pandemic and later visited with the children twice per week under the Division's virtual visitation policy. An unknown number of the unsupervised visitations occurred at the parents' home.

The Case Manager testified Mother also rectified the second provision addressing financial stability or regular employment. Since March or April 2020, Mother has been working part-time as a caregiver at a home care agency, Angels Within, at a rate of $9.50 per hour. Later, in September 2020, Mother began secondary employment at Wal-Mart, where she started at $11 per hour, but currently earns $15 per hour and works 40 hours per week. The Case Manager testified that Mother sent him a text message with an accompanying check stub attachment approximately one week before the termination trial verifying her employment as a caregiver. He knew she was also working at Wal-Mart.

The Case Manager testified that Mother did not comply with the third provision requiring adequate housing.[3] When he last inspected the family home in November 2020 on Harris

---

[3] The trial included considerable evidence surrounding Mother's housing situation which affected the trial court's findings pursuant to multiple subsections of the statute, including § 211.447.5(2)(d) (abuse and neglect), § 211.447.5(3)(a) (failure to rectify) and § 211.447.5(5)(a) (unfitness).

Avenue, he was not allowed access to the second floor. Further, he testified that the parents informed him that the furnace was not working and he observed "a hole in the kitchen," or deficient flooring. However, he did not describe the kitchen hole in any further detail, explain how this deficiency rendered the housing inadequate or specify the threat.[4] Since these multiple failures prevented compliance with the housing condition, the Case Manager requested another follow-up inspection but the parents informed him that the home was being gutted and not in a condition for evaluation.

The Division referred Mother to various housing programs without success. She participated initially in a family unification program which would have rewarded her with a Section 8 housing voucher at the program's conclusion but she was terminated after missing two classes. Additionally, the Division introduced her to the Annie Malone program which provides security deposits and the first month's rent among other services. The Annie Malone program referred Mother to a housing opportunity in downtown St. Louis but she declined it because her work colleague lived in this particular building and informed her it was a dangerous location with too much gunfire in the area. According to a written report prepared by the Division, incorporated into the file and submitted to the court, the Division referred Mother to other social service providers to presumably address her housing situation on eight occasions between May 2019 and March 2020.

Mother testified that she will continue to look for alternative housing pursuant to the Division's recommendation but her current living arrangement on Harris Avenue is presently acceptable for her and her five children and she wants to resist relocating to an unsafe area.[5] Her

---

[4] During his testimony, the Case Manager did not refer to a rat infestation, a foul odor in the home or any other housing deficiencies as previously alleged in the petition.

[5] Mother has three additional children besides T.M.P. and T.T.P.

current location offers adequate space and includes air conditioning. Although the furnace is not functional, Mother uses space heaters to compensate during the time periods marked by cooler temperatures.[6] Further, she testified that the hole in the kitchen more closely resembles a cosmetic issue and there was not any danger of someone falling through the floor. At trial, she confirmed that she was continuing to search for alternative housing and had investigated between 15 and 20 alternative housing options and even identified one potential substitute location by address.

The Case Manager testified that Mother complied with the social service plan's remaining three conditions: (4) parenting skills training, (5) individual therapy and (6) psychological evaluation. More specifically, she completed parenting education classes, attended individual and family therapy and participated in a psychological evaluation. Although she tested positive for marijuana on three occasions in 2018, random drug testing was ultimately discontinued after Mother repeatedly tested negative for marijuana or other illegal substances. Further, the Case Manager testified that the parents, including Mother, provided the minor children with food, clothing and gifts but was unaware if she, Father or anyone else had provided any child support or financial assistance since they were admitted into the Division's care.

By the time of the termination trial, the Case Manager and DJO agreed that Mother was mostly compliant with the provisions of the social service plan with the exception of her failure to obtain appropriate housing.[7] Subsequently, the Case Manager concluded that Mother had not

---

[6] Case Manager testified he "deemed [the home] to be unsafe for the children because it could not provide for the heat of the home." When questioned about Mother using space heaters, he responded that space heaters were a fire hazard depending on the type. There was no evidence the space heaters used by Mother were unsafe.

[7] According to the Division's Petition to Terminate Parental Rights filed on November 18, 2020, the only housing issues warranting termination were that "the home [was] infested with rats, and [had] a bad smell," not that there was a hole in the kitchen or deficient heating.

sufficiently improved her circumstances under the social service plan to justify placing the minor children with her.

Both the DJO and the Case Manager testified that they believed that Mother loves her minor children and she is bonded to them. Similarly, they equally believe that the two minor children love their Mother and are emotionally attached to their other three siblings. Mother said that she loves her children very much and would "do anything for them."

On June 21, 2021, the juvenile court entered its judgment terminating Mother's parental rights. More specifically, the court acted under § 211.447.5(2)(d) (abuse and neglect) because Mother failed to offer monetary compensation to assist with the children's care while in state custody and she failed to provide verification of safe and stable housing.

Likewise, the court found termination was warranted for two reasons under § 211.447.5(3) (failure to rectify). Although the social workers testified that she complied with the financial stability/employment condition of the social service plan, the court found Mother deficient because the Case Manager had not had an opportunity to verify her employment status as a caregiver. The court also found she failed to rectify the housing condition by resisting the assistance offered by social service providers, including Annie Malone.

Similarly, the court terminated Mother's parental rights pursuant to § 211.447.5(5)(a) (unfitness). More specifically, the court found that she was unfit to participate in the parent-child relationship because she failed to secure "appropriate and safe living conditions" for the minor children.

Points on Appeal

Appellant asserts three related points on appeal, arguing the trial court's termination findings under three independent statutory grounds were against the weight of the evidence.

In Point I, Mother argues the court erred after finding that she failed to provide financial assistance to the minor children while they were in the Division's custody and she did not establish a residence considered safe, stable, and suitable pursuant to § 211.447.5(2)(d) (abuse and neglect).

In Point II, Mother similarly argues that the court erred after finding that she failed to comply with the two provisions of her court-ordered social service plan, specifically obtain and maintain financial stability/regular employment as well as appropriate housing pursuant to § 211.447.5(3)(a) (failure to rectify).

In Point III, Mother also argues that the court erred after finding that she was "unfit to be a party to the parent-child relationship" due to her failure to obtain and maintain appropriate and safe housing for herself and the minor children pursuant to § 211.447.5(5) (unfitness).

Standard of Review

In termination of parental rights cases, this court defers to the trial court's ability to judge witness credibility and will affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *In re S.Y.B.G.,* 443 S.W.3d 56, 59 (Mo. App. E.D. 2014). Conflicting evidence is reviewed in the light most favorable to the trial court's judgment. *Interest of J.L.D.,* 560 S.W.3d 906, 911 (Mo. App. E.D. 2018). However, the grounds for termination must be supported by clear, cogent and convincing evidence, meaning the evidence must "instantly tilt[] the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *Id.* The burden of proof is on the party seeking termination. *Interest of D.L.P.,* 638 S.W.3d 82, 88 (Mo. App. E.D. 2021).

7

**A. In Point I, Mother argues that the trial court erred when finding that she failed to provide financial support and she did not establish suitable housing under § 211.447.5(2)(d)**

Under § 211.447.5(2), a party's parental rights may be terminated if the "child has been abused or neglected":

> In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:
>
> (d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development.

The juvenile court terminated Mother's parental rights under § 211.447.5(2)(d) after making twin findings that she did not offer "monetary compensation" to assist with the minor children while in the Division's custody and she failed to provide verification of a safe and stable residence pursuant to § 211.447.5(2)(d). We disagree because we conclude that the court's findings are not supported by substantial evidence.

Statutes such as § 211.447.5(2) are strictly construed against termination and in favor of the parent and preservation of the natural parent-child relationship. *J.L.D.,* 560 S.W.3d at 911. When finding Mother failed to support the minor children, the juvenile court specifically faulted Mother for failing to offer any monetary compensation while they were in the Division's care. Relying on *In re G.G.B.,* 394 S.W.3d 457, 474 (Mo. App. E.D. 2013), the Division argues that Mother is obligated to make financial payments even when the juvenile court did not specifically order the parent to pay child support. However, the Missouri Supreme Court concluded that purchasing items for the minor children is worthy of consideration and minimal contributions reflect on the parents' intent to maintain the parent-child relationship which contradicts

8

termination. *In re S.M.H.*, 160 S.W.3d 355, 366-68 (Mo. banc 2005) (citing *In the Interest of J.M.L.* 917 S. W.2d 193, 196 (Mo. App. W.D. 1996)).

In addition, the Southern District of this court has held that there was not substantial evidence supporting the trial court's finding that a mother failed to support her child while in foster care although she worked, supported three other children and did not provide child support payments for the minor child in state custody. *In re C.A.L.*, 228 S.W.3d 66 (Mo. App. S.D. 2007). In *In re C.A.L.*, the mother was originally receiving a form of public assistance and was even hospitalized before she began working at or around the time of the termination hearing. *Id.* at 69. Although she did not pay child support while the child was in foster care, she gave the minor child some toys and clothing, similar to the circumstances in the present matter. *Id.* at 71. Holding that her failure to make monetary contributions did not support a finding that the mother would be unable to provide for her child in the future, the court said the issue is whether the mother fulfilled her obligation to support, visit and communicate with the minor child. *Id.*

Here, the evidence is uncontradicted. Mother made efforts to comply with the statute and support the minor children by providing clothing, food, toys and a birthday gift while they were in the Division's custody, all of which was confirmed by the Case Manager during his testimony. And while the food and clothing purchases reflect her support, remembering to bring a gift on a birthday signals her recognition of a special day in the child's life. Notably, this collective action reflects on her desire "to continue the parent-child relationship." *In re S.M.H.*, 160 S.W.3d at 366-67.

After reviewing the record and taking into consideration the collective evidence, we find Mother demonstrated her desire to continue the relationship with the minor children by exercising "visitation," "supporting" them emotionally and physically when providing them with

clothing, food and a birthday gift as well as "communicating" her desire to remain in their lives by bolstering the parental-child bond despite their physical separation. *In re C.A.L.*, 228 S.W.3d at 71-73.

Additionally, low-income or poverty is not a basis for termination of parental rights. *D.L.P.*, 638 S.W.3d at 93-94. Mother did not begin working until March or April 2020, when she began her employment as a caregiver, part-time, approximately four hours daily, seven days a week, for $9.50 per hour. In September 2020, she began a second job working at Wal-Mart at $11 per hour but was earning $15 per hour at the time of trial in May 2021. Collectively, Mother's income from both jobs totals less than $18,000 per year. Even after working two jobs, Mother is further impeded by a low-income status, a factor that cannot be a basis for termination. *D.L.P.,* 638 S.W.3d at 93-94.[8]

The juvenile court also found that Mother did not provide verification of a safe and stable residence when deciding that termination was warranted under § 211.447.5(2)(d). While many of Mother's problems with the Division revolve around the housing issue, the record is unclear and is missing a consistent evidentiary thread justifying the juvenile court finding that the Harris Avenue residence is unsafe. Like the court's finding regarding the lacking monetary contribution, we conclude that the juvenile court's finding regarding the housing deficiency is not supported by substantial evidence.

Mother has resided on Harris Avenue for most if not the entire time period since the Division took the two minor children into custody on February 16, 2018. The Case Manager visited the property repeatedly, approximately four times since October 2020. When visiting this

---

[8] When remanding this matter to the juvenile court for further consideration, we are not suggesting that Mother's financial contributions are indefinitely excused. Understandably, paying child support is a factor in the court's termination considerations under § 211.447.5(2)(d) and the case law clearly states that this is an existing obligation regardless of court order. *G.G.B.,* 394 S.W.3d at 474.

property, Case Manager testified that "there was a hole in the kitchen" or what he referred to as his "concerns with the flooring." Conversely, Mother described the hole as a cosmetic issue that did not rise to the danger level of someone of falling through the floor. The Case Manager does not go into further detail, fails to describe the hole size, its location, what if any subflooring exists beneath it and the potential danger associated with it.

According to the record, the deficient furnace or the lack of heat was another complaint about the house articulated by the Case Manager. When confronted about the fact that Mother was using space heaters, the Case Manager indicated that this alternative could present a potential fire hazard, depending on the model or type of heater. However, he was unaware of the type of space heater Mother was utilizing and if it presented any danger.

Even the Division's actions belie how dangerous they view the Harris Avenue residence. Specifically, they allowed Mother to exercise her visitation periods at the Harris Avenue residence. For at least a one-year period of time preceding the pandemic, "a parent aide . . . transport[ed] the children to the parents' home" for unsupervised visits, according to the Case Manager. These visitation periods occurred at the residence deemed "unsafe" by the Division and lasted approximately four hours in length.

While the Harris Avenue residence may be lacking or less than ideal, the collective evidence fails to forge a "clear, cogent and convincing" evidentiary trail leading to the conclusion that this is an unsafe environment. Even the Division allowed the children to visit the residence, despite its deficiencies.

Accordingly, we conclude that the trial court's twin findings that Mother did not make monetary contributions although physically or financially able and she declined to acquire adequate housing is not supported by substantial evidence. Point granted.

11

**B. In Point II, Mother argues that the trial court erred after finding that she failed to comply with the social service plan regarding employment and housing pursuant to § 211.447.5(3)(a)**

Mother further contends that termination was not warranted under § 211.447.5(3)(a), involving the social service plan. Specifically, it reads:

> The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:
>
> (a) The terms of the social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

The court's findings under § 211.447.5(3)(a) center around Mother's deficiencies with the court-ordered social service plan. The juvenile court found Mother complied or largely complied with every provision of the social service plan except that she failed to maintain financial stability or regular employment (second provision) and secure adequate housing (third provision). As outlined in the discussion above, these findings are not supported by substantial evidence and require reversal.

When finding Mother failed to obtain and maintain financial stability or regular employment pursuant to the social service plan's second condition, the juvenile court found that Mother did not provide her pay stubs until days before the May 13, 2021 termination trial which did not allow the Case Manager an opportunity to verify employment. This conclusion is contrary to the evidence presented. Significantly, the Case Manager unequivocally stated that Mother complied with this provision and provided him with verified employment. Mother electronically submitted an Angels Within check stub "a week or so" prior to the trial and the

12

Case Manager was already aware of her Wal-Mart employment. Further reassuring the juvenile court about her efforts to achieve employment stability, Mother testified in great detail about her work chronology. She began working as a caregiver at Angels Within approximately March or April 2020 and, additionally, she started working her second job at Wal-Mart beginning in September 2020.[9]

Section 211.447(3)(a) and related case law simply instruct the trial court to evaluate to what extent the parent is making progress under the social service plan when considering termination. "The issue is whether progress has been made in complying with the service agreements . . ." *S.M.H.*, 160 S.W.3d at 369. Progress does not need to be full or substantial. *Id.* The parent-child relationship is fundamentally protected and should rarely, if ever, be terminated, especially when a parent makes progress toward creating a safe environment for their children and improving their relationship. *J.L.D.*, 560 S.W.3d at 908. Unquestionably the uncontroverted evidence reflects Mother made progress, if not completely complied, with the second condition involving financial stability or employment. She began working more than one year prior to the parental termination trial and was working two jobs for nearly an eight-month time period immediately preceding the trial.

Likewise, the court found that Mother did not comply with the social service plan's third condition, securing appropriate housing. Social services directed Mother to multiple services and programs to assist her in acquiring alternative housing yet she was unsuccessful. More specifically, the court noted that Annie Malone found an apartment for Mother in late 2020 or early 2021 but Mother rejected it without visiting it. During her testimony, Mother explained that her work colleague lived at this proposed location but the individual was attempting to depart

---

[9] Additionally, she provided details about the volume of her work hours as well as her wage scale regarding both jobs.

due to the existing danger, including regular gunfire. Declining to consider a single housing opportunity that is described as dangerous by someone as familiar as a work colleague does not indicate a lack of effort.

Admittedly, the trial court is in a better position to make credibility decisions such as assessing Mother's reliability about pursuing alternative housing. *See In re K.A.W.,* 133 S.W.3d 1, 11 (Mo. banc 2004). However, we reverse the trial court's finding on this issue also because the statute simply requires the court to evaluate if the parent is making progress or efforts to comply with the social service plan. § 211.447.5(3)(a); *In re A.M.W.,* 448 S.W.3d 307, 315 (Mo. App. E.D. 2014).

Reflecting on her efforts toward progress, Mother independently investigated and considered 15 to 20 different housing alternatives. In fact, she identified and singled out one specific housing location at the trial as a suitable alternative.[10] Additionally, Mother testified that her search for affordable, alternative housing was further narrowed by her limited income, another factor hindering her success but equally worthy of consideration when balancing her compliance with this provision. Based on these collective factors, we find the evidence of her progress in securing proper housing satisfies the requirements of the statute and outweighs the court's finding that she failed to comply with this provision.

The juvenile court correctly concluded that Mother complied with the balance of the social service plan provisions addressing visitation, parenting skills training, individual therapy and chemical dependency following the Division's extensive and involved monitoring process.

---

[10] The Division points to Mother's failure to complete the "family unification program," the reward for completion being a Section 8 housing voucher. Mother testified she was unaware that missing two classes would result in her ejection from the program. Moreover, Mother attended numerous other court-ordered classes and programs while working full-time.

14

The collective evidentiary record reflects that Mother was making progress complying with the social service plan pursuant to the statute. Point granted.

## C. In Point III, Mother argues the trial court erred when finding that she is unfit pursuant to § 211.447.5(5)(a) (Unfitness)

The juvenile court also found Mother unfit to be a party to the parent-child relationship pursuant to § 211.447.5(5)(a). The trial court based this finding on Mother's "failing to obtain and maintain appropriate and safe housing for herself and the child."[11]

Termination of parental rights based on § 211.447.5(5)(a) requires finding "[t]he parent is unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse . . ." The trial court must look to see whether there are "specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child." *Id.* This statutory language is strictly construed in favor of preservation of parental rights. *J.L.D.,* 560 S.W.3d at 911 (quoting *K.A.W.*, 133 S.W.3d at 12).

Courts considering unfitness look for specific examples of abuse and conditions affecting the parent-child relationship as well as examine the facts for evidence of a breakdown in that relationship. *See* § 211.447.5(5)(a); *see also In re C.S.,* 351 S.W.3d 264, 267-68 (Mo. App. W.D. 2011) (listing numerous specific conditions affecting the parent-child relationship upon which the trial court based its finding of unfitness). As always, the burden to prove these conditions is on the state, and the evidence must be clear, cogent and convincing. *J.L.D.,* 560 S.W.3d at 911.

---

[11] The judgment also makes an ambiguous reference to "failure to support," apparently again in reference to the housing issue. To the extent the trial court intended this as a separate ground for its unfitness finding, we reject it for the same reasons we reject the trial court's finding of lack of support under § 211.447.5(2)(d) Point I.

This requires evidence that "instantly tilts" the scales in favor of termination. *D.L.P.*, 638 S.W.3d at 89.

The trial court supports its unfitness finding by stating Mother has not maintained appropriate and safe living conditions and did not demonstrate her ability to obtain appropriate housing in the foreseeable future. As previously discussed, the finding that Mother did not demonstrate her ability to obtain appropriate housing is against the weight of the evidence. Mother investigated 15 to 20 alternative housing locations, even identifying one by address. Further, her search has been impeded by her financial limitations and her reticence to relocate to a dangerous location, a concern which is worthy of the court's consideration. *See D.L.P.*, 638 S.W.3d at 93-94 (parents' financial condition is not a basis for termination of parental rights).

The court concluded that Mother failed to maintain safe living conditions because of a lack of a functioning furnace and the hole in the kitchen. However, the evidence shows Mother made efforts to address the heating situation by utilizing space heaters. Likewise, the hole in the kitchen was not described with any particularity and the Division failed to explain in even simple, straightforward language how this single deficiency condemned the safety of the entire residence or amounted to "specific abuse." *See In re P.C.*, 62 S.W.3d 600, 605 (Mo. App. W.D. 2001) (expressing doubt that failure to maintain a "safe and clean house" and other shortcomings constitute specific abuses within the meaning of the statute). Moreover, the fact that the Division concluded it was appropriate for Mother to host unsupervised visitation at her house further weighs against a finding that her housing was so deficient as to render her unfit to parent. Point granted.

**Conclusion**

The housing concerns must be considered in light of the evidentiary record as a whole. Admittedly, Mother has been dilatory in her efforts to secure alternative housing and her financial contributions are lacking. These deficiencies outlined by the trial court do not demonstrate a breakdown in the relationship between parent and child, just as they do not warrant termination. Mother visited the minor children, provided them with food, clothing and gifts, and willfully participated in a litany of training, counseling and therapy programs. *D.L.P.*, 638 S.W.3d at 92 (compliance with social service plan offers predictive evidence with respect to parental unfitness). She accomplished much or at least some of this while she was working two different jobs.

Mother is confronted with termination of her parental rights, which is a fundamental right under the law. *K.A.W.*, 133 S.W.3d at 12 (termination of parental rights involves fundamental liberty interests protected by constitutional due process). This requires this court (and the trial court) to consider her more modest gains as well as her more glaring deficiencies. Examining these competing considerations in full, and in light of the Division's burden to prove its case with clear, cogent and convincing evidence that "instantly tilts" the scales, we conclude that the trial court's unfitness finding is not supported by substantial evidence.

Under the law, we do not assess the best interests of the minor children until the Division demonstrates that grounds for termination exist. *S.Y.B.G.*, 443 S.W.3d at 59 (citing *In re K.A.C.*, 246 S.W.3d 537, 543 (Mo. App. S.D. 2008)). Based on the record and the evidentiary presentation, we do not believe that they have met this burden at this time and we therefore do not reach the best-interests analysis.

17

Undoubtedly, the juvenile court and the Division have been patient and made efforts to assist Mother's multiple year quest for a stable environment. Moving forward, Mother has the opportunity to influence what course the Division pursues. This opinion should not be misinterpreted as excusing her failure to comply with their directives and, depending on her future actions, she and the minor children may find themselves in another termination hearing.

We grant Points I through III. Accordingly, we reverse the trial court and remand this matter for proceedings consistent with this opinion.

_____
Thomas C. Clark II, Judge

Robert M. Clayton III, P.J., concurs.
Gary M. Gaertner, Jr., J., concurs.

18